**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALESSANDRA MADERNI,
an individual, and
DREAMOLOGY LABS, INC.,                           Case No.: 1:26-cv-23846-DPG
a Delaware corporation,

     *Plaintiffs,*

v.

PIERFRANCESCO VAGO,
an individual, MSC CRUISES (USA) LLC,
a Delaware limited liability company with
its principal place of business in Fort Lauderdale, and
MSC CRUISES S.A., a Swiss corporation,

     *Defendants.*

_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Alessandra Maderni ("Maderni") and Dreamology Labs, Inc. ("Dreamology Labs") (collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(1) (no Defendant having yet been served), file this First Amended Complaint against Defendants Pierfrancesco Vago ("Vago"), MSC Cruises (USA) LLC ("MSC USA") and MSC Cruises S.A. ("MSC Cruises") (collectively, "Defendants"), and allege as follows:

### PRELIMINARY STATEMENT

1.    This case arises from the abuse of power by the Executive Chairman of a global cruise company and the corporate exploitation that followed. Defendant Pierfrancesco Vago,

Executive Chairman of MSC Cruises, used his position to cultivate a relationship with Plaintiff Alessandra Maderni, a young female founder whose company had developed valuable, cutting-edge experiential entertainment and technology IP. In reliance on Defendants' repeated assurances of partnership and of strict confidentiality, Plaintiffs shared extensive proprietary concepts with MSC—only to have those concepts later appear in MSC initiatives while Plaintiffs were cut out.

2.      In early February 2022, while Plaintiffs' proposals and term sheets for multi-million-dollar collaborations were under active consideration, Vago arranged a meeting with Maderni at the Setai Hotel in Miami under the guise of finalizing business terms that had been pending since 2019. Behind closed doors, he shifted from business discussion to unwanted physical advances and initiated non-consensual sexual contact. When Maderni verbally objected and attempted to disengage, Vago responded with reassurances that he would support her ventures, creating substantial pressure for her to comply in order to preserve the commercial partnership and promised business opportunity. Within days of this encounter, Vago's tone and behavior changed: meetings were canceled, communications slowed, prior commitments were "paused" without explanation, and a multi-million-dollar deal in late-stage negotiation was effectively withdrawn.

3.      By that point, Plaintiffs had already delivered detailed storytelling frameworks, brand architectures, technology and platform plans, partnership structures, and exclusive creative concepts—materials that MSC obtained in confidence and then used to inform at least six commercial offerings that had no precedent in its portfolio. A vendor case study later credited Vago as the "creative driver" of one such offering, which received a World Waterpark Association Leading Edge Award for creativity and innovation. The abrupt withdrawal of support and continued internal use of Plaintiffs' work destroyed funding prospects, derailed business momentum, and caused severe emotional and financial harm. MSC's withdrawal did not result

from market conditions or any genuine change in business priorities. In hindsight, it became clear that Vago never intended to finalize a deal. Instead, he used his corporate authority and personal charm to extract professional value, proprietary intellectual property, and emotional and sexual submission under the false pretense of partnership — providing nothing in return.

4.  Plaintiffs' ventures were not only commercially innovative but ESG-driven by design—integrating sustainability storytelling, automated profit-sharing with environmental, social and humanitarian causes, and immersive content aligned with ocean conservation and cultural preservation. By aligning with Plaintiffs, MSC had the opportunity to authentically reinforce its public branding as "the environmental cruise line" and access the growing ESG-conscious consumer and investor segments. Instead, it exploited these concepts internally while abandoning the partnership, exposing a significant gap between its public commitments and private conduct.

5.  From 2019 to 2025, Vago repeatedly induced Plaintiffs to share new iterations of their IP and innovative ventures and made at least five separate verbal commitments that MSC would proceed with the partnership—each followed by written term sheets, follow-up emails, and contemporaneous confirmations shared with advisors and investors. Each time, he walked back or ignored those commitments while MSC continued to benefit from Plaintiffs' ideas. In parallel, he maintained a pattern of sexually charged, manipulative, and coercive communications, including threats to cut off contact if Maderni did not continue providing intimate content, further leveraging the power imbalance between them. Through this lawsuit, Plaintiffs seek to hold Defendants accountable for sexual battery, retaliation, fraudulent inducement, misappropriation of trade secrets, copyright infringement, trade dress infringement, and related torts, and to send a clear message that even the most powerful executives and corporations are not above the law. Plaintiffs

assert no claim for breach of contract in this action; every claim pleaded herein arises under United States federal statutes or Florida statutory and common law.

## PARTIES

6. **Plaintiff Alessandra Maderni** is an individual and lawful permanent resident of the United States residing in Miami. She is the founder and CEO of Dreamology Labs, Inc. and the creator of multiple proprietary experiential entertainment concepts and immersive technology platforms. She has suffered personal, emotional, and economic injuries as a result of Defendants' conduct.

7. **Plaintiff Dreamology Labs, Inc.** is a Delaware corporation with its principal place of business in Florida. Dreamology Labs owns the intellectual property, proprietary materials, and venture assets developed by Maderni, including *Shipsomnia*, CulturePunk, Dreamology, Exploraverse, and XploraWorld. Dreamology Labs has suffered direct economic harm as a result of Defendants' misappropriation, infringement, and related misconduct.

8. **Defendant Pierfrancesco Vago** is an individual residing in Switzerland. He is the Executive Chairman of MSC Cruises S.A., the global parent entity of MSC Cruises (USA) LLC. At all relevant times, Vago acted within the actual, apparent, and/or ratified scope of his authority as a senior corporate officer of MSC entities, including MSC USA. Vago purposefully directed business activities, communications, and meetings into the State of Florida—including the February 2022 Miami encounter at issue—and is therefore subject to personal jurisdiction in this Court.

9. **Defendant MSC Cruises (USA) LLC ("MSC USA")** is a Delaware limited liability company registered to transact business in Florida, with its principal place of business in Fort Lauderdale, Florida. MSC USA is the United States operating arm of MSC Cruises S.A. and

conducted business with Plaintiffs in Florida and elsewhere in the United States. MSC USA is liable for the economic and business-tort claims alleged herein under principles of agency, respondeat superior, ratification, and alter-ego, and for its own independent misconduct, including its receipt, internal analysis, and commercial exploitation of Plaintiffs' confidential materials and retaliatory business actions. MSC USA's marketing and analytics teams received and performed ROI modeling on Plaintiffs' proposals, and MSC USA markets and sells to United States consumers the shipboard attractions and entertainment offerings alleged herein to be derived from Plaintiffs' intellectual property.

10. Defendant **MSC Cruises S.A.** is a Swiss corporation headquartered in Geneva, Switzerland. MSC Cruises S.A. is the parent entity of MSC Cruises (USA) LLC, and operates the global MSC cruise line. MSC Cruises S.A. exercised direct control over the conduct of Defendant Pierfrancesco Vago and MSC Cruises (USA) LLC, benefitted from the misconduct alleged herein, and is liable for the economic and business-tort claims alleged herein under principles of agency, ratification, respondeat superior, and alter-ego liability. MSC Cruises S.A. purposefully directs substantial business activities toward Florida and the United States, including through MSC Cruises (USA) LLC, and has sufficient minimum contacts to confer personal jurisdiction.

**JURISDICTION AND VENUE**

11. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., the Copyright Act, 17 U.S.C. § 101 et seq., the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964. This Court has original and exclusive jurisdiction over Plaintiffs' copyright claim pursuant to 28 U.S.C. § 1338(a), and no foreign court

may adjudicate claims arising under the United States Copyright Act. The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

12. This Court has personal jurisdiction over Defendants pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, and the Due Process Clause. Defendants purposefully directed business activities, negotiations, communications, and meetings into the State of Florida, including the 2022 meeting at the Setai Hotel in Miami Beach during which the sexual misconduct alleged herein occurred. Defendants also committed acts in Florida resulting in injury to Plaintiffs in Florida and the United States. MSC USA is registered to transact business in Florida, maintains its principal place of business in this State, and is subject to general jurisdiction in Florida. MSC Cruises S.A. maintains its North American Cruise Division headquarters in Miami, developed and operates its principal United States terminal at Port Miami, and homeports vessels featuring the attractions at issue in Florida and Texas.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the February 2022 Miami encounter and negotiations and business dealings conducted with MSC USA, whose principal place of business is located within this District. The February 2022 encounters occurred in Miami Beach, and MSC's North American Cruise Division headquarters and its Port Miami terminal are located in this District.

## FACTUAL ALLEGATIONS

### A. Plaintiffs' Business, IP Portfolio, and Industry Standing

14. Plaintiffs are innovative entrepreneurs who developed proprietary experiential-entertainment intellectual property and immersive technology platforms integrating travel,

storytelling, culture, and advanced digital engagement. Their flagship ventures—including *Shipsomnia*, a cruise-integrated experiential IP and festival franchise, and XploraWorld (previously called Exploraverse), an ESG-driven Web3 and AI activation platform—were widely recognized within the industry as category-defining concepts. Plaintiffs' broader vision was to build an alternative-reality experiential universe at the intersection of film, gaming, music, travel, and technology, creating a scalable platform for storytelling, audience engagement, immersive experiences, and IP expansion. The XploraWorld platform incorporated ESG mechanisms at its core through automated smart contracts designed to allocate 51% of XploraWorld's own profits to social, environmental, humanitarian, and cultural causes, while reducing reliance on traditional commission structures and increasing profit margins for participating travel partners. *Shipsomnia*'s festival IP blended ocean literacy, sustainability storytelling, and immersive cultural programming—positioning it as a flagship opportunity for MSC to demonstrate true ESG leadership. Former senior executives from Disney and executives from other major entertainment companies, including Karl Holz, Joe Lanzisero, Adam Leipzig, Jason Garner and Zach Merck, publicly and privately endorsed Plaintiffs' work. Dreamology Labs owns all associated IP and invested substantial time, capital, and expertise in the creation and protection of these assets.

15.     Beginning with only a few hundred thousand dollars in seed capital from angel investors, Plaintiffs developed Shipsomnia and successfully executed two story-driven festivals (proof-of-concept sailings) in Asia and Europe that attracted guests from more than 100 countries, generated millions of dollars in revenue, and produced a promotional trailer that received more than 26 million organic online views, demonstrating global market validation, audience engagement, executional capabilities, and significant commercial potential. Plaintiffs declined a significant strategic investment opportunity in Asia in order to pursue a broader vision of relocating

to the United States and expanding their intellectual property into a multi-platform experiential universe with support from leading talent in Hollywood, gaming, festivals, themed entertainment and technology. By the time Plaintiffs began engaging with MSC in 2019, their ventures had progressed beyond the conceptual and pilot stages and evolved from a charter-event model into a scalable experiential IP business designed for cruise-line integration, permanent shipboard venues, island activations, branded entertainment formats, and multi-platform  expansion across travel, film, entertainment, gaming, music, brand partnerships, and digital experiences, supported by proprietary intellectual property, defined commercialization strategies, industry validation, and active discussions with strategic partners and capital sources.

### B.  MSC's Initial Approach and the Confidential 2019 Pitches

16.    On or about August 7, 2019, Defendant Vago began expressing interest in Plaintiffs' projects following an introduction by Karl Holz, the former President of Disney Cruise Line **(see Exhibit 1)**. Shortly thereafter, Vago personally initiated direct email communication with Plaintiff Maderni, and a formal presentation meeting was scheduled at MSC headquarters in Geneva.  From the outset, Vago positioned himself as the decision-maker with full authority to greenlight partnerships, a perception reinforced by his executive authority and integration into MSC's ownership structure through marriage into the controlling Aponte family.

17.    On or about September 1, 2019, Holz sent Vago a strong endorsement of the *Shipsomnia* concept, describing it as a uniquely scalable experiential IP with global application **(see Exhibit 2)**. Vago responded enthusiastically. Plaintiffs circulated the email thread to members of their investment and legal advisory team—including Brian Mac Mahon of Expert Dojo, a Startup Accelerator & VC in Southern California, in preparation for anticipated negotiations with

MSC **(see Exhibit 3)**. This endorsement and Vago's response contributed to investor interest and reliance on MSC's expressed intent to partner.

18.     Prior to Plaintiffs' introduction to Defendant Vago through Karl Holz in 2019, Defendants were not aware of Shipsomnia or Plaintiffs' experiential entertainment ventures. Although Plaintiffs had conducted limited proof-of-concept sailings, those projects were niche initiatives that were not widely known within the cruise industry. Defendants' knowledge of Plaintiffs' advanced concepts, commercialization strategies, IP expansion plan, and commercial potential was derived through Plaintiffs' confidential presentations and disclosures.

19.     On or about September 17, 2019, Plaintiffs formally presented the *Shipsomnia* concept to Vago and several MSC executives in Geneva under a written nondisclosure agreement between Mad Fresh Entertainment Inc. and MSC Cruises S.A. (the "2019 NDA") **(see Exhibit 4)**. The 2019 NDA strictly prohibited MSC from using or disclosing the confidential information disclosed under it for any purpose other than evaluating a potential partnership; neither Plaintiff, nor Vago in his personal capacity, nor MSC USA was a party to it. During the presentation, Vago expressed significant enthusiasm, telling Maderni, "*I'm going to make you huge! You only have to impress me. Are you ready to play in the big league? You are reconnecting with your Italian roots for something huge.*" MSC executives observed the presentation, a group photograph was taken, and Plaintiffs reasonably understood that a high-level partnership was being pursued in good faith.

20.     During these confidential presentations and follow-up submissions, Plaintiffs disclosed not only creative concepts but also confidential commercialization strategies and proprietary know-how for launching the Shipsomnia festival chapter IP through a season of story-driven sailings and for transforming that intellectual property into immersive, permanent, and scalable shipboard venues and commercial offerings. These disclosures included go-to-market

strategies, venue concepts, guest engagement mechanics, partnership structures, implementation plans and monetization frameworks. Although certain creative elements were displayed in limited proof-of-concept sailings, Defendants received those materials in conjunction with extensive nonpublic strategic, operational, and commercial information disclosed in confidence, including methodologies for adapting and scaling the concepts into permanent, revenue-generating cruise attractions. MSC later implemented this same commercialization strategy in multiple onboard attractions and entertainment offerings derived from the Shipsomnia intellectual property and its individual chapter concepts.

21.     Immediately after the Geneva meeting, Vago escalated MSC's involvement. He invited Maderni and her co-founder to MSC's Ocean Cay private island in the Bahamas, to MSC's London headquarters, and to the Chantiers de l'Atlantique shipyard in Saint Nazaire, France to tour the newest MSC ship at the time, the MSC Grandiosa (Maderni and her co-founder were responsible for their own personal travel expenses such as round-trip flights to the Bahamas and London and a one way return ticket from France) **(see Exhibit 5)**. MSC flew Plaintiffs and senior executives together by private jet from London to France, arranged ship tours, and facilitated closed-door working sessions regarding long-term integration of the *Shipsomnia* IP into MSC vessels and destinations. During these meetings, Vago personally requested formal proposals, deal structures, and financial terms for multi-year collaborations, reinforcing the impression that MSC intended to enter a binding commercial relationship.

22.     Even before and immediately following the Geneva presentation, Vago began soliciting Plaintiffs' creative and strategic input on additional MSC initiatives unrelated to the original *Shipsomnia* pitch, further demonstrating that he was extracting value from Plaintiffs' expertise at the outset of the relationship. Prior to the Geneva meeting, Vago requested Plaintiffs'

evaluation and improvement of an internal MSC "robot bartender" project. MSC personnel provided Plaintiffs with detailed internal materials and decks for review, and Vago asked Plaintiffs to assess the concept, provide strategic direction, and propose enhancements. In response, Plaintiffs collaborated with Joe Lanzisero, former Senior Vice President of Disney Imagineering, to develop substantive creative recommendations. Plaintiffs prepared a full creative presentation— including branding concepts, experiential ideas, and mood boards—which was presented directly to Vago aboard the private jet during travel from London to Saint-Nazaire, France.

23.     During the same period, while touring the MSC Grandiosa in Saint-Nazaire, France — a Meraviglia-Plus class ship — Vago specifically asked Plaintiffs to assess the ship's Carousel Lounge theater, previously used for Cirque du Soleil productions, and to develop new immersive entertainment concepts for that venue. MSC later launched an immersive entertainment experience that Plaintiffs allege is a knockoff of their confidential work in the same Carousel Lounge theater space aboard the MSC Virtuosa — a sister ship of the same Meraviglia-Plus class as the Grandiosa. These requests expanded the scope of Plaintiffs' disclosures well beyond an initial pitch and put MSC in possession of detailed, venue-specific creative concepts disclosed in confidence.

24.     Following MSC's repeated requests for formal terms, Maderni—working with industry experts including Adam Leipzig, former President of National Geographic Films and a senior Disney Studios executive, and entertainment attorney Ken Hertz—prepared a comprehensive master agreement outlining the structure, deliverables, and revenue terms for a long-term *Shipsomnia*–MSC partnership. Vago subsequently contacted Karl Holz to further discuss the opportunity, signaling that MSC was seriously evaluating Plaintiffs' proposals at the highest corporate levels.

11

25.     On or about November 5, 2019, shortly after the Geneva presentation and Plaintiffs' site visit to MSC's Ocean Cay private island in the Bahamas, and to a newly launched MSC cruise ship in Saint-Nazaire, France, Maderni emailed Vago to summarize next steps. Vago responded promptly and affirmatively, stating, "*Hi Alessandra thank you so much. Look forward to receiving the proposal.*" This communication reinforced Plaintiffs' understanding that MSC intended to move forward and that Vago remained personally engaged in the development of the partnership **(see Exhibit 6)**.

26.     On or about November 26, 2019, Plaintiffs delivered the initial formal proposal to Vago. The proposal included multiple *Shipsomnia* integration pathways—festival sailings, shipboard venue concepts, and island activations. Vago reviewed the materials and directed Plaintiffs to prioritize a scaled-down version of the festival program "for a couple of cruises," specifically requesting a "*Shipsomnia* chapter proposal" as the first phase of implementation **(see Exhibit 7)**. This feedback reflected MSC's active negotiation posture and its intent to refine and operationalize the partnership.

27.     In January and February 2020, Plaintiffs provided Vago and MSC a revised festival-sailings chapter proposal incorporating MSC's requested adjustments. Vago forwarded the materials to MSC CEO Gianni Onorato for feasibility review. Onorato scheduled a follow-up call with Maderni, expressed enthusiasm for the concept, and circulated the proposal to MSC USA's marketing and analytics teams for ROI modeling—steps MSC typically undertook only for initiatives proceeding toward approval. During these discussions, Plaintiffs outlined an expanded, family-friendly *Shipsomnia* program projected to increase fare yields by approximately 50%. Onorato responded positively, confirming he would move the project to the next internal review phase.

28.     On or about March 1, 2020, amid emerging COVID-19 concerns, Maderni emailed Vago and Onorato to express support and highlight how the disruptive nature of the *Shipsomnia* IP activation could help offset anticipated industry headwinds by generating positive media attention and demand. Vago replied, "*Thank you Alessandra, will indeed keep it in our mind and your words are much appreciated.*" At no point did MSC withdraw interest in the project. Instead, MSC repeatedly reaffirmed its intent to revisit and finalize the deal following stabilization of global conditions.

**C.  "Wait Until After COVID": Repeated Assurances While MSC Quietly Builds Competing Offerings**

29.     As COVID-19 emerged globally in early 2020, MSC informed Plaintiffs that it was pausing advancement of the *Shipsomnia* agreement due to industry uncertainty. Throughout 2020 and 2021, Vago repeatedly reassured Maderni that the delay was temporary, telling her that her "professional capabilities have enormous potential," that the partnership would resume "after COVID" and that he was "happy to sign the deal after COVID." Plaintiffs reasonably relied on these assurances. However, during the same period—and while Plaintiffs' confidential materials remained in MSC's possession subject to obligations of confidence—MSC developed and launched multiple new experiential offerings whose design frameworks, thematic elements, narrative arcs, and brand architecture closely mirrored Plaintiffs' submissions. Prior to receiving Plaintiffs' materials, MSC had never deployed concepts of this type or scope. MSC did so without compensating Plaintiffs, without credit, and without notifying them, despite ongoing communications implying an eventual partnership.

30.     On or about September 25, 2020, Maderni submitted an additional proposal to Vago outlining a potential joint venture and a direct-to-consumer experiential model tied to the *Shipsomnia* IP. A virtual meeting followed with Ruben Rodriguez, President of MSC USA, who

13

stated that MSC could not proceed immediately due to COVID-related uncertainty but expressed interest in re-engaging once consumer demand stabilized. Vago and CEO Gianni Onorato were copied on these communications, reinforcing Plaintiffs' understanding that the project remained active at the highest levels of MSC leadership.

### D. Escalating Flirtation, Blurred Boundaries, and Emotional Dependence

31.     By April–May 2021, Plaintiffs had refined their direct-to-consumer experiences proposals and accompanying term sheets and shared updated materials with Vago through email and Facebook Messenger. Beginning in 2020 and continuing through 2021, Vago began injecting personal and flirtatious commentary into business discussions and initiated one-on-one Teams meetings with Maderni, where he consistently expressed flattery and personal admiration. Over time, this cultivated trust, emotional reliance, and growing attraction — which Vago deliberately encouraged while positioning himself as a strategic partner, remarking, "*I'm happy to sign it post-COVID, we are the strongest financial partner for you, you are so beautiful and fantastic! You are super smart and have huge potential!*" These comments blurred the boundary between professional negotiations and personal interest and marked the beginning of Vago's pattern of leveraging his corporate authority to cultivate inappropriate personal access to Maderni — not through force, but through deception, dependency, and emotional coercion. Her compliance was not freely or knowingly given.

32.     On or about January 31, 2022, after continued discussions regarding the *Shipsomnia* IP and the Web3-immersive-technology partnership via Facebook messenger, Maderni sent Vago the Dreamology/Exploraverse platform deck. Vago responded by scheduling an in-person meeting for February 2, 2022, at the Setai Hotel in Miami. Leading up to the meeting,

Vago's communications became increasingly affectionate, personal and full of flattery, diverging from prior professional exchanges.

### E. The February 2022 Miami Setai Encounters and Coercive Leverage of Corporate Power

33.    On or about February 2, 2022, at approximately 4:00 p.m., Maderni met Vago at the Setai Hotel for what she understood to be a business meeting to finalize next steps in their long-standing negotiations. After briefly discussing the project at the hotel's outdoor restaurant, Vago asked her to accompany him to his suite to retrieve a folder for his next meeting. Once inside, he unexpectedly kissed her on the cheek and stated that he would take her out on a date later that evening to continue the business discussion. Afterward, he sent an email stating, "*It took me an hour to recover after I saw you, my brain was overcharged with blood and I couldn't even speak or make sense of anything,*" and informed her that his meeting was running late and that he would have to cancel the evening plans, confirming the encounter and underscoring his attempt to recast a business meeting as personal intimacy **(see Exhibit 8)**.

34.    On or about February 3, 2022, Vago asked to meet with Maderni again at approximately 4:00 p.m. at the Setai Hotel. Before the meeting, he emailed her, "*I missed you terribly, I couldn't sleep last night knowing you were so close.*" This time, Vago lured Maderni back to his suite by telling her to please follow him so that they could talk while getting ready to catch a flight **(see Exhibit 9)**.  At the meeting, Vago initiated a sexual encounter, further exploiting the power imbalance he had carefully cultivated. During the interaction, when Maderni verbally objected and attempted to disengage and sought clarity about the status of their business relationship and whether he cared, Vago responded, "*I get it, I understand the potential and It's beyond care, I would do anything for you.*" This created substantial pressure for her to comply to

preserve the promised business opportunity. Maderni did not feel free to object or withdraw consent due to the power imbalance, economic dependency, and Vago's repeated professional assurances. Immediately after the encounter, he reaffirmed his intent to bypass MSC's board and that MSC would proceed with both the immersive technology platform and a series of *Shipsomnia* festival sailings and direct-to-consumer experiences, to be financed through MSC USA's marketing budget. These assurances were material to Plaintiffs' continued reliance on MSC.

### F.  Post-Miami Withdrawal of Support, Pretextual Excuses, and Early Retaliation (Spring–Summer 2022)

35.    On or about February 16, 2022, consistent with Vago's representations, Maderni resent the Dreamology / Exploraverse presentation and a term sheet formalizing the partnership structure and financing commitments. She contemporaneously informed senior executives, advisors, and her team that Vago had represented that he would bypass internal approval processes and that he agreed to move forward in phases with a budget below $60 million, as previously discussed during COVID, reflecting Plaintiff's reliance on those representations **(see Exhibit 10)**. Although Vago received the materials, he did not respond, marking the beginning of a sudden change in communication following the Miami encounter.

36.    On or about March 15, 2022, having received no feedback, Maderni followed up regarding the term sheet and next steps **(see Exhibit 11)**. Vago again ignored her email but sent a brief Facebook Messenger message withdrawing support and stating, "For us the Metaverse is at an embryonic stage and also with this historic war in Ukraine, it's not the right time for us." This explanation was inconsistent with his prior assurances, and Plaintiffs reasonably understood it as a pretext. Maderni informed her advisors and colleagues that MSC appeared to be backing away from its commitments.

37.     In or around April 2022, frustrated by Vago's continued ambiguity and lack of commitment, Maderni pressed him in private Facebook Messenger chats to move forward and finalize the deal. In response, Vago scheduled another Teams meeting. However, when the meeting began, Maderni was surprised to find that it included Luca Pronzati, MSC's Chief Innovation Officer, and that the purpose was for her to explain her immersive tech platform concept—despite no NDA being in place. Vago himself was over an hour late, and given the circumstances and her growing discomfort, Maderni left before the meeting began.

38.     On or about May 16, 2022, after intermittent Messenger conversations, Maderni sent Vago an updated Exploraverse platform deck identifying MSC as the lead strategic sponsor with custom-designed activations. By this point, the communications between Vago and Maderni had become increasingly personal, with Vago offering intermittent affection while withholding professional clarity. In these exchanges, Maderni expressed emotional distress over the sudden loss of support and the impact on her business.

39.     On June 7, 8, and 12, 2022, Maderni sent additional follow-up emails containing updated platform materials and term-sheets, seeking the confirmation Vago had repeatedly promised. Vago opened the emails but did not reply and failed to attend a scheduled call. Relying on Vago's prior assurances, Plaintiffs informed venture capital partners that MSC traction was imminent, only to be placed in an increasingly untenable position as Vago continued to withdraw.

40.     By June 2022, after weeks of unexplained silence from Vago following his prior commitments, Maderni grew increasingly distressed. On or about June 10, 2022, she emailed Vago expressing concern for his well-being and confusion over his sudden withdrawal. Her communication reflected the emotional strain caused by Vago's abrupt shift in behavior—

particularly given the intimacy he had initiated and the professional commitments he had repeatedly affirmed.

41.     On or about July 17, 2022, without addressing the outstanding term sheet or the commitments he had made, Vago introduced a junior marketing manager, Silvia Godinho, via email. His message read: *"Let me introduce Alessandra, she has quite a vision… let's see if we may have an interest… Please keep me in the loop Silvia."* This introduction appeared to be an attempt to reframe the partnership as exploratory rather than the advanced commercial negotiation Vago himself had orchestrated. Maderni responded by noting that her prior communications—including the formal term sheet—had gone unanswered.

42.     On or about July 20, 2022, frustrated by three years of shifting assurances and unexplained reversals, Maderni declined the proposed meeting with Silvia and copied Vago on her response. She wrote: *"The whole team is turned off by MSC now—3 years of talking and doing nothing."* In a separate email to Vago, she identified specific patterns of manipulative behavior, including chronic lateness, broken promises, prolonged silence, and inconsistent statements—contradictions made even more destabilizing in light of his prior declarations such as, *"I would do anything for you."*

### G. Attempts to Reset the Relationship and Continued Stringing Along (Late 2022–Mid-2023)

43.     On or about September 2, 2022, still seeking clarity and stability, Maderni emailed Vago an update on her Metaverse platform, believing she had secured external capital—funding that ultimately collapsed due to market volatility and MSC's withdrawal of support. Vago responded with praise, writing: *"Great job Alessandra, I've always thought that you are the number 1, I'm very proud of you. I will support you, you know that."* This message again revived Plaintiffs' belief that MSC would move forward **(see Exhibit 12)**.

44.     On or about September 3, 2022, in an effort to reset the relationship and obtain the closure or commitment she needed to advance her ventures, Maderni emailed Vago expressing a desire for a fresh start, writing: *"I really want to see you… I will always want you to be my hero."* Vago replied in similarly intimate language—*"Me too Alessandra, I like you so so much… Will make a plan. Kiss."*—further blending personal and professional spheres without taking any substantive steps toward honoring the partnership commitments he had repeatedly promised.

45.     By November 2022, after months of inconsistent communication and Vago's failure to schedule promised meetings, Maderni attempted to distance herself emotionally. In or around November 2022, feeling hurt and confused, she deleted intimate message threads and blocked Vago on Facebook. Her attempt to disengage reflected the cumulative emotional impact of Vago's conduct and her growing awareness that his assurances were not being honored.

46.     On or about February 25, 2023, seeking clarity on both the personal and professional fronts and still hoping MSC would proceed with the *Shipsomnia* partnership, Maderni emailed Vago asking whether he remained interested in moving forward with the sailings. She noted that, for her, their connection had felt "REAL," expressing a desire for honesty regarding the status of both relationships. Vago responded warmly, writing: *"Hi Alessandra, it's so wonderful to hear from you… With immense pleasure, I'll organize a team agenda… Tell me, what do you have in mind for Shipsomnia?"* His response again revived Plaintiffs' understanding that the partnership would advance.

47.     Between March 27 and April 15, 2023, Maderni sent new proposals and term sheets in response to Vago's renewed expressions of interest. Vago did not respond to any of these materials. Yet on May 12, 2023—when no substantive business discussion had occurred—he replied to her birthday message with: *"My love, thank you so so much! Missing you…"* This

selective engagement reinforced the pattern in which Vago responded to personal outreach while ignoring professional obligations.

48.     On or about May 29, 2023, still attempting to understand MSC's abrupt withdrawal and its effect on her ventures, Maderni emailed Vago explaining the campaign she was preparing and expressing confusion over why the business opportunity had been discarded. She hoped the decision was not tied to their personal history. Vago responded: "*Hi Alessandra, I can guarantee you it has nothing to do with what happened between us, actually it's the opposite,*" suggesting that their intimacy was a benefit rather than an impediment, but vaguely stating that he needed "more details" to persuade his team—despite having had those details for years.

### H. The 2023 Brand Partnership Presentation, One-Off "Work-for-Hire" Offer, and NDA Maneuvering

49.     On or about July 11, 2023, in reliance on Vago's assurances that he remained supportive, Maderni sent MSC a comprehensive Exploraverse Brand Partnership Presentation. Shortly thereafter, Vago's secretary asked for a printable version without an NDA— despite the sensitive-and proprietary nature of the content. Trusting Vago and believing the relationship to be near finalization, Maderni complied. As a result, additional proprietary material was placed in MSC's possession without renewed contractual safeguards.

50.     On or about July 20, 2023, anticipating an upcoming meeting arranged through Vago's secretary, Maderni emailed Vago expressing that she missed him and reiterating her belief in the disruptive business potential of the partnership. Vago responded in kind—"*I miss you too, wow what a comment, don't we have a meeting coming up?*"—again intertwining personal intimacy with professional advancement in a way that reinforced Plaintiffs' reasonable reliance on his assurances.

20

51.     On or about July 26, 2023, during the virtual meeting scheduled by Vago's secretary, Vago appeared outwardly impressed with Plaintiffs' work for the Exploraverse platform and its festival universe with *Shipsomnia* being one of its premiere IP, stating, "*You absolutely deserve it.*" He then questioned whether MSC would be the first brand partner to adopt the platform and said he could not guarantee sales distribution for multiple sailings. When pressed for a concrete proposal, Vago suggested reducing the proposal to a one-off "work-for-hire" payment with a licensing fee for a single *Shipsomnia* festival production tied to the Exploraverse platform—an offer drastically inconsistent with years of negotiations and his own prior commitments. He then ended the meeting abruptly telling her he had another important meeting to attend, leaving Maderni feeling hurt and unsupported, despite his recent comment that she absolutely deserved it. Still believing that MSC intended to move forward in some capacity, Maderni informed Lufthansa Innovation Hub and her internal team that MSC appeared ready to cover production costs for the *Shipsomnia* IP, though she expressed growing concern about Vago's inconsistency.

52.     On or about September 13, 2023, despite having assured Plaintiffs that a formal proposal for the festival activation would be forthcoming, Vago provided no further communication. In the days that followed, after Maderni sent emotionally charged emails highlighting the pattern of manipulation and broken promises, she insisted that MSC execute an NDA covering the printed copy of her Exploraverse presentation that Vago had requested without protection. MSC signed the NDA, and she requested return of the physical copy. Vago responded: "*I'm truly sorry… My idea was to help you by perhaps trying a three-day event… I thought I had been very generous…*" When Maderni proposed a mutually acceptable alternative consistent with their earlier discussions and for another meeting to finalize a budget, Vago again ceased communication.

21

**I.   2023–2025: Escalating Virtual Sexual Coercion, Emotional Control, and Final Break**

53.     Between September 16, 2023, and March 24, 2025, Vago and Maderni exchanged more than 21 email threads and extensive messaging that reflected a consistent pattern: Maderni sought clarity and stability for her ventures, while Vago oscillated between encouraged sexualized communication, and selective engagement on business matters. During this period, Vago made increasingly explicit and coercive comments—such as "*Make me your pig*" **(see Exhibit 13)**, "*Remind me how beautiful you are naked,*" "*I can't wait to see more intimate photos of you,*" "*Nobody can know about this,*" and "*I'm going to get you back, I've always viewed you as the Queen of Shipsomnia.*" He also stated, "*I'm open to any deal as long as it makes sense,*" yet refused to provide substantive feedback and finalize agreements. Vago responded when it served his personal interests or when he sought additional insights from Plaintiffs' IP, while ignoring communications that requested accountability, professional boundaries, or business commitments.

54.     On or about January 2024, Maderni began experiencing growing discomfort with the increasingly intimate and sexually charged nature of her communications with Vago, which he had encouraged through repeated messages such as "I want more, I want more!" and "Please drive me crazy." To create a perceived safer space to share intimate content and express her feelings, she initiated use of Facebook's "disappearing messages" feature—a function that deletes messages 24 hours after being read and notifies participants if screenshots are taken. During one such exchange, Facebook alerted Maderni that Vago had taken a screenshot of a message in which she was attempting to navigate the dynamic and impose emotional boundaries. The message stated, approximately: "*Just because I'm emotional, it doesn't mean that I'm looking for happily ever after and think we can make it work. I understand that your family will always come first, but that doesn't mean that you can't genuinely care for me.*" This reflected Maderni's attempt to offer the

sexual submission she believed Vago wanted, while still trying to preserve some level of emotional safety and self-respect in the absence of business accountability. When she asked why he took a screenshot, Vago deflected, replying, "*Oh, I don't know why my screen went all dark.*" In hindsight, Maderni believes the screenshot was a manipulative tactic intended to preserve selective evidence that could later be used to falsely portray the relationship as consensual—despite the broader context of coercion, professional and emotional dependency, and abuse of power.

55.    On or about October 1, 2024, following a period of emotional distress and no contact, Vago resumed communications with Maderni through WhatsApp and a few Microsoft Teams meetings. These renewed exchanges were marked by bad faith inducement and the continued dangling of business opportunities. Vago made statements such as, "*I'll get you back, I always viewed you as the Queen of Shipsomnia,*" "*I'm open to any deal as long as it makes sense,*" and "*It's my dream to be intimate with you,*" along with repeated broken promises to meet in person—on Valentine's Day and other specific dates— to further induce emotional and sexual engagement from Maderni in a virtual, fantasy-driven context, while continuing to avoid business accountability. The WhatsApp exchanges included explicit sexual messages, video calls involving sexual acts, and emotionally manipulative tactics, all while Vago avoided accountability and evaded business commitments. For example, when Maderni deleted intimate photographs and asked to meet in person for clarity, Vago responded, "*If you delete photos again, I will stop talking to you,*" using access and communication as leverage **(see Exhibit 14)**. During another WhatsApp video call in or around November or December 2024, Vago appeared from a hotel room in Brussels, engaged in explicit sexual conduct, and told Maderni words to the effect that he was there with other cruise-line CEOs whom he would bring to Plaintiffs' platform. This statement further linked his sexualized conduct to renewed business inducement and reinforced Plaintiffs'

belief that he continued to control access to valuable commercial opportunities. When she expressed discomfort about privacy and asked to delete intimate exchanges, he replied, "*Obviously nobody can know about this, but I'm not worried about you because you are an accomplice*"—an effort to guilt and silence her while keeping her intimately engaged.

56.     When Maderni attempted to articulate the emotional harm caused by his conduct and her intention to end the dynamic, Vago ignored the substance of her statements, deflecting with superficial flattery, self-pity, and renewed sexualized remarks. This pattern—alternating between coercive intimacy and emotional avoidance—served to maintain emotional and psychological control over Maderni while continuing to withhold professional clarity or support. By June 2025, Maderni informed Vago that the relationship was unhealthy, that he had exercised disproportionate emotional power over her, and that she was ending all communication. In that exchange, she told him directly that he had maintained a negative psychological hold over her that caused her to invest in him both professionally and personally for years. She later confided to concerned friends that she had remained engaged due to emotional pressure, sunk cost, and the belief that MSC would ultimately honor its commitments, though she had never disclosed the intimate nature of Vago's misconduct or the trauma-bonding effect it had on her.

57.     By March 2025, MSC began distancing itself more formally. On or about March 2025, Vago instructed Marco Ottaviani, Head of CRM and Customer Activation at MSC Cruises, to call Maderni to explain that MSC would not serve as the initial cruise line brand partner for the XploraWorld Universal Points Exchange— despite years of assurances to the contrary regarding a partnership. Once again, MSC received proprietary, cutting-edge market intelligence at no cost. Internal emails confirm that they printed Maderni's confidential presentation without a renewed NDA, despite the deck being clearly marked "Confidential." To soften the blow of walking away,

Vago told Maderni, "*I'll share a detailed analysis of our reasoning. You deserve that.*" After weeks of delay, he forwarded a brief email that revealed MSC had misunderstood even the basic mechanics of the platform. Vago also ignored Maderni's follow-up when she raised the *Shipsomnia* IP again—despite having messaged her via WhatsApp in November 2024, "*I'll get you back, I've always viewed you as the Queen of Shipsomnia.*" These actions provide further evidence of misappropriation, bad faith inducement, and emotional manipulation disguised as support.

### J.   MSC Executive Involvement, Internal Awareness, and Ratification of Vago's Conduct

58.     Throughout the 2019–2025 period, multiple senior MSC executives interacted with Maderni in connection with her proposals. These interactions included attendance at formal pitch presentations, internal evaluations of her concepts, meetings, calls, and written communications.

59.     Giulio Biggi, an MSC corporate lawyer, coordinated the execution of the 2019 nondisclosure agreement governing the first *Shipsomnia* presentation, confirming that MSC's receipt and use of Plaintiffs' materials was subject to contractual confidentiality obligations.

60.     Trevor Young, Vice President New Building, attended the September 17, 2019 *Shipsomnia* pitch in Geneva and was one of the executives who received a Shipsomnia branded coin bearing the Kraken silhouette. During a subsequent dinner, Young remarked that Vago routinely told presenters statements such as "I'll make you huge… are you ready to play in the big league?", characterizing these as grandiose talk rather than genuine commitments—demonstrating internal awareness of Vago's pattern of exaggerated inducements. Young was subsequently quoted in a publicly circulated vendor case study praising the Kraken tentacles of the Pirates Cove Aquapark as helping to 'bring the park's story to life' — placing the same named MSC executive at both the confidential disclosure of Plaintiffs' Kraken concept and in the public celebration of its commercial result.

61.     Andrea Gangale, Senior Vice President of Product Development and Guest Experience, also attended the September 17, 2019 pitch and participated in MSC's internal consideration of the *Shipsomnia* concept.

62.     Bernhard M. Stacher, Senior Vice President of Shipboard Hospitality, also attended the September 17, 2019 *Shipsomnia* presentation in Geneva, reflecting MSC's multi-departmental involvement in evaluating the partnership.

63.     In 2019, MSC's Chief Innovation Officer, Luca Pronzati, personally toured Maderni and her co-founder through the MSC Grandiosa, a newly launched Meraviglia Plus class vessel at the Chantiers de l'Atlantique shipyard in Saint-Nazaire, France - as part of MSC's assessment of how *Shipsomnia* could be integrated into shipboard programming. Pronzati later attended a virtual meeting in 2022 regarding Plaintiffs' immersive technology platform, but the meeting never commenced because Vago was over an hour late, and Maderni left before he arrived because she became concerned that MSC had not executed the NDA required for the presentation—further illustrating MSC's inconsistent handling of contractual protections for Plaintiffs' confidential material.

64.     During the 2019 tour of the MSC Grandiosa, a newly launched Meraviglia Plus class ship in France, Paolo Sitia, a lead Italian architect working on the project, privately commented to Maderni that Vago was known internally as "the big angry boss with everyone else, but a pussycat with his wife," and asked her not to repeat the remark. The remark reflected broader internal criticism and discussion among MSC personnel regarding Vago's personality and conduct.

65.     MSC CEO Gianni Onorato was personally engaged in evaluating the *Shipsomnia* concept during the September presentation in 2019. After Vago forwarded the proposal to him, Onorato expressed enthusiasm and requested financial modeling to advance the project. In early

2020, he participated in follow-up calls and emails, confirming that he viewed the integration of the *Shipsomnia* IP as commercially promising and wished to ensure the revenue projections and marketing ROI would support implementation.

66.     During a virtual meeting in 2020, Ruben Rodriguez, President of MSC USA, commented that Vago appeared unusually impressed and captivated by Maderni—implying his interest was influenced by her appearance—and stated that MSC typically partnered only with "global brands," signaling that Vago's intense personal involvement was atypical. Rodriguez's remarks further demonstrated internal awareness that Vago's conduct toward Maderni was irregular and potentially inappropriate.

67.     On or about July 2022, Vago forwarded an introductory email to Silvia Godinho, a New Builds Marketing Manager, referencing a prior meeting on the "metaverse" and suggesting she explore additional opportunities with Maderni. Given MSC's long pattern of non-responsiveness, withdrawal, and refusal to advance signed term sheets, Maderni reasonably interpreted the referral as yet another diversion designed to extract additional information while avoiding meaningful commitment. She declined to proceed, recognizing the pattern of exploitation.

68.     In October 2023, after Vago had printed Plaintiffs' Exploraverse presentation without a signed NDA and then withdrew from commitment, in-house counsel Mio Massimiliano insisted that any NDA be placed under UK jurisdiction before MSC would return or destroy the confidential material. This confirmed MSC's continued use of Plaintiffs' proprietary information and its attempt to retroactively shield Vago's conduct rather than honor prior promises or commitments.

69.     In March 2025, Vago instructed MSC executive Marco Ottaviani, Head of CRM and Customer Activation, to call Maderni and explain—on Vago's behalf—why MSC would not commit to being the first cruise line brand partner for the XploraWorld Universal Points Exchange, despite years of assurances and multiple representations that a partnership would move forward. This was consistent with Vago's pattern of avoiding direct accountability while having subordinates communicate the withdrawal of commitments he had personally made.

### K.  MSC's Misappropriation and Commercialization of Plaintiffs' Confidential Concepts

70.     After obtaining detailed access to Plaintiffs' confidential creative and commercial materials through confidential disclosures beginning in September 2019 and through subsequent confidential submissions continuing into 2025, including live presentations, pitch decks, trailers, mood boards, photos, story synopses, commercialization plans, venue concepts, guest-engagement mechanics, and physical production assets such as steampunk hats and other themed costume elements— MSC began rolling out a slate of so-called "new" entertainment offerings. Based on direct comparisons and evaluations by senior experts in themed entertainment and IP development, these attractions incorporated not merely isolated themes, but distinctive combinations of Plaintiffs' confidential narrative architectures, character archetypes and story-world roles, visual design language, venue-integration concepts, audience-participation mechanics, and commercialization frameworks for translating Shipsomnia Chapter IP into shipboard attractions and branded entertainment experiences. These confidential combinations and implementation frameworks were presented in detail to Executive Chairman Pierfrancesco Vago and his team during confidential pitch sessions and had not previously appeared in MSC's portfolio prior to its engagement with Plaintiffs.

28

71.     One of the earliest new offerings launched after Plaintiffs' confidential disclosures to MSC was *Chronicles – Stories That Take Flight*, a Carousel Productions at Sea show that premiered aboard *MSC Virtuosa* in or around May 2021. The production centers on a mysterious storyteller who opens an illustrated storybook as the central narrative device, unlocking portals to magical realms where gravity is defied, and "incredible adventures" unfold. This narrative directly parallels Plaintiffs' *Shipsomnia* storybook mechanic, in which opening an illustrated book reveals successive chapters of a mythological sea voyage—a core creative framework disclosed to MSC during the live Geneva pitch and in subsequent confidential video and pitch materials shared in confidence. The visual design of *Chronicles*, including its book-motif styling, ornate steampunk flourishes, and portal transitions, closely reflects imagery and themes presented during Plaintiffs' live pitch and in the confidential decks and video materials provided to MSC in confidence. Even the *Chronicles* logo, typography, and font treatment closely resemble the *Shipsomnia* brand and logo style as presented in Plaintiffs' confidential pitch materials, reinforcing the broader pattern of misappropriation.

72.     MSC also launched *Arkymea – The Hidden World* aboard MSC Virtuosa, with a public press release dated March 28, 2022. The production tells the story of a scientist who discovers a secret world where "the wildest ideas and most ambitious dreams become reality" through the use of a mysterious device. The show features extravagant steampunk-style props, clockwork machinery, portal-like effects, and an eccentric inventor character who invites the audience into an alternate realm. These themes, characters, and design elements mirror core components of Plaintiffs' *Shipsomnia* pitches, including the use of a science-explorer archetype, portals into hidden worlds, and an aesthetic framework defined by goggles, gears, and retro-futuristic machinery. Plaintiffs had previously presented these motifs in mood boards, posters, and

29

story synopses disclosed to MSC in confidence. In particular, Plaintiffs' *Isle of Salvaga* pitch included a scientist-adventurer character who discovers a lost island civilization and invites participants to "enter the story" through puzzle-based and visual cues, including steampunk-infused tools and mysterious portals. *Arkymea's* visual presentation and storyline were not present in MSC's prior offerings and align with the thematic sequencing and design language in Plaintiffs' confidential submissions. The overlap between Plaintiffs' disclosed creative assets and MSC's resulting production supports the broader pattern of misappropriation across MSC's post-engagement entertainment slate.

73.     In or about September 2022, MSC launched *ImaginOcean – Underwater Amazement*, a theatrical production for the Chora Theater aboard MSC Seascape. Promotional materials describe the show as an "ocean-themed spectacle" featuring mermaid-led storytelling, aerial choreography, aquatic puppetry, and marine-inspired couture costumes. Guests are invited to "dive deep" into a fantastical celebration of the sea, set against visuals of an underwater temple or ancient ocean city populated by mythical creatures. These thematic and visual elements were core to Plaintiffs' *Shipsomnia* brand and *The Search for Lost Rhythms* narrative and their signature party The Shipsomnia Ball where the spirit of the oceans come alive, which were disclosed to MSC executives in trailers, visual decks, and confidential pitch presentations. In particular, Plaintiffs had depicted a central mermaid figure surrounded by anthropomorphic sea creatures in an ancient Atlantean setting, anchoring a narrative that combined fantasy, mythological sea lore, and immersive environmental storytelling. The combination of narrative content, character types, and underwater festival theming in *ImaginOcean* aligns closely with the creative expressions disclosed by Plaintiffs. The similarities, both visual and thematic, reinforce a broader pattern of MSC adopting Plaintiffs' protected creative materials.

30

74.     One of MSC's most visually distinctive and heavily marketed onboard attractions is the *Pirates Cove Aquapark*, installed on both MSC Seashore and MSC Seascape. According to WhiteWater, the design vendor behind the waterpark, the project was originally developed as an intergalactic, space-themed concept. However, MSC Executive Chairman Pierfrancesco Vago personally intervened to reject the space theme and directed the creative team to incorporate a pirate ship and giant Kraken tentacles—a marked and deliberate shift toward the nautical and mythological theming that Plaintiffs had previously presented in detail during confidential pitch sessions. At those meetings, Plaintiffs had shown MSC photographs and video footage of their *Shipsomnia* stage and festival environments, which featured giant Kraken tentacles emerging from the ship's main deck and wrapping around elements of the vessel, forming part of a broader story world rooted in ocean lore and interactive, guest-driven narratives. The final installation closely mirrors Plaintiffs' visual and thematic materials, down to the centerpiece: hand-carved Kraken tentacles wrapping around ship structures, described by MSC's own Vice President of New Building as helping to "bring the story to life." The tentacles deployed in Pirates Cove reflect the same design language as Plaintiffs' installations, including similar sculptural form, color schemes, surface treatment, and overall scale, creating a strikingly similar visual impression. MSC's marketing framed the Aquapark as an immersive pirate adventure where "guests become the main characters in an exciting pirate story"—language that tracks directly with Plaintiffs' descriptions of *Shipsomnia* as a live-action sea festival in which guests actively participate within a mythological narrative. In 2023, the *Pirates Cove Aquapark* received the Leading Edge Award from the World Waterpark Association, recognizing creativity and innovation in waterpark design. The award underscores the commercial and reputational value MSC derived from the attraction,

which Plaintiffs allege was developed through the unauthorized use of their confidential creative concepts and visual expression.

75.     The MSC Virtuosa entered service featuring the *Atmosphere Pool Fish Sculptures*, consisting of multiple oversized, vertically oriented fish sculptures emerging from the water as the central design feature of the vessel's main pool deck. These sculptures are stylized with a ceramic glaze-inspired, rough painted-on design, detailed scale patterns, and a marine two-tone color palette, arranged around a shallow pool. Plaintiffs' Mermaid Sanctuary pool stage, which was a centerpiece of the Shipsomnia "Tale of the Kraken" chapter festival, featured the same distinctive design concept: multiple oversized, vertically-oriented fish sculptures of similar height, size, and color emerging from the water, with the same ceramic glaze-inspired aesthetic and marine two-tone color palette, arranged around a shallow pool as part of an immersive themed environment. Photographs of Plaintiffs' Mermaid Sanctuary fish sculptures were included in materials previously disclosed to Vago. Based on Defendants' access to those materials, the timing of MSC Virtuosa's design and construction, and the substantial visual similarities reflected in the side-by-side comparison, Plaintiffs allege on information and belief that the Atmosphere Pool Fish Sculptures derive from Plaintiffs' original creative expression and form part of Defendants' broader appropriation of the Shipsomnia service trade dress.

76.     In an official press release dated April 30, 2025, MSC also introduced a new interactive game-show offering named "BOXES," which MSC publicly described as "original," as part of its fleetwide youth program available across its vessels. According to MSC's public descriptions, BOXES requires contestants to open selected boxes revealing unexpected challenges. Plaintiffs had previously disclosed to Defendants a confidential box-based experiential concept and related commercialization framework developed as part of the Shipsomnia IP. The public

description of BOXES closely parallels those confidential disclosures. During the parties' confidential discussions, Vago repeatedly praised Plaintiffs' experiential box concept. Based on Defendants' access to those confidential materials, the timing of MSC's rollout, the public description of BOXES, and the broader pattern of conduct alleged herein, Plaintiffs allege on information and belief that this offering incorporates or derives from Plaintiffs' confidential trade secrets, including commercialization concepts, implementation frameworks, and methods for transforming Shipsomnia IP into scalable, repeatable guest experiences capable of fleetwide deployment. The full extent of Defendants' use of Plaintiffs' confidential information is presently within Defendants' possession and is expected to be revealed through discovery.

77. Collectively, these offerings—*Chronicles*, *Arkymea*, *ImaginOcean*, *Pirates Cove Aquapark* installations on multiple ships, the *Atmosphere Pool Fish Sculptures*, and *BOXES* rolled out fleetwide across all MSC vessels —constitute at least six discrete, revenue-generating entertainment knockoffs developed and commercialized by MSC following its confidential access to Plaintiffs' creative and commercial materials **(see Exhibits 15-23)**. Each attraction integrates a distinctive combination of narrative arcs, character archetypes, thematic environments, visual motifs, and interactive mechanics that Plaintiffs had previously presented to MSC and Executive Chairman Pierfrancesco Vago as part of the *Shipsomnia* IP suite. These were not generic themes or publicly available ideas, but confidential combinations of expressive content, commercial know-how, and trade-secret frameworks for converting Shipsomnia festival Chapter IP into permanent, onboard, revenue-generating attractions, as disclosed through live presentations, pitch decks, story synopses, original artwork, implementation materials, commercialization plans, and physical production pieces that were shared with MSC in confidence. MSC never compensated Plaintiffs, never credited them, and never disclosed that its publicly celebrated and award-winning

attractions and "original" shows were, in material part, derived from Plaintiffs' confidential creative and commercial work.

### L. Shipsomnia Experiential Service Trade Dress

78.     Shipsomnia was conceived, branded, promoted, and commercially presented as a unified immersive entertainment universe consisting of interconnected story-driven chapters designed for commercial expansion across cruise entertainment experiences. Through Plaintiffs' revenue-generating proof-of-concept sailings, guests experienced a voyage-long experiential entertainment format combining chapter-based storytelling, interconnected themed environments, live performance, visual design, technology, and active guest participation. Plaintiffs also developed additional interconnected Shipsomnia chapters for future commercial deployment, which were presented to Defendants as part of Plaintiffs' broader Shipsomnia IP and commercialization strategy.

79.     The Shipsomnia service trade dress consists of the distinctive overall selection, arrangement, coordination, and presentation of: (a) a captain-led voyage through an interconnected maritime-fantasy universe structured as recurring story-driven chapters centered on exploration, discovery, and hidden worlds; (b) recurring narrative, thematic, and visual elements—including mythical sea creatures, explorers, scientists and inventors, mermaids, ancient ruins, Kraken character, underwater environments, stylized marine sculptures, and a steampunk-inspired maritime aesthetic—used together to create a recognizable Shipsomnia story world; (c) recurring storytelling devices, including illustrated books, captain's logbooks, maps, portals, artifacts, puzzles, boxes, and interactive discoveries through which guests enter and progress through the narrative; (d) coordinated scenic, theatrical, audiovisual, costume, prop, lighting, musical, underwater puppetry, sculptural, and environmental design; and (e) integration of the story world

and entertainment programming across multiple shipboard venues as part of a unified, voyage-wide guest experience.

80.     Plaintiffs do not claim trade dress protection for any individual theme, character, story element, visual motif, theatrical technique, or functional feature standing alone. Plaintiffs claim only the distinctive overall look, feel, combination, arrangement, coordination, and presentation of those elements as the source-identifying trade dress of the Shipsomnia experiential entertainment service. Nothing in this paragraph or Count limits or disclaims Plaintiffs' separate copyright, trade secret, or other intellectual property rights.

81.     Plaintiffs used the claimed service trade dress in commerce before Defendants introduced the accused offerings. Through revenue-generating proof-of-concept chapter sailings, promotional materials, and commercial partnership activities, Plaintiffs consistently presented the immersive experience under the Shipsomnia name and branding, identifying Plaintiffs as its source within the relevant cruise-entertainment market.

82.     The Shipsomnia trade dress is distinctive because its particular combination of chapter-based voyages, ocean-fantasy storytelling, steampunk-inspired maritime aesthetics, recurring visual identity, environmental design, narrative sequencing, and guest-participation mechanics creates a recognizable overall presentation identifying Plaintiffs as the source of the Shipsomnia experience. The claimed trade dress is nonfunctional because those creative and aesthetic choices are not necessary to provide cruise entertainment, and numerous alternative themes, formats, visual presentations, and methods of guest engagement were available. The claimed combination is unique and unusual in the relevant field of cruise and immersive-festival entertainment; it is not a common or basic entertainment format, nor a mere refinement of any commonly adopted and well-known form of entertainment presentation. In the alternative, the

Shipsomnia trade dress has acquired secondary meaning through Plaintiffs' commercial sailings, promotional campaigns, media coverage, industry exhibition (including at the World Travel Market trade show), and the consistent public association of the claimed presentation with the Shipsomnia brand and with Plaintiffs as its source.

83.     Through Plaintiffs' presentations, demonstrations, audiovisual materials, production assets, and commercialization proposals, Defendants obtained detailed knowledge of the Shipsomnia service trade dress. As alleged in paragraphs 70 through 77, Defendants thereafter introduced multiple entertainment offerings that reproduced material aspects of the Shipsomnia service trade dress previously implemented through Plaintiffs' proof-of-concept sailings. Defendants' access to and detailed knowledge of the Shipsomnia service trade dress, followed by their introduction of substantially similar overall presentations, further evidences copying and a willful course of conduct.

84.     Viewed collectively and in their entirety, Defendants' accused offerings appropriated the distinctive overall combination, arrangement, coordination, and presentation of the Shipsomnia service trade dress—the totality of elements that made the commercialized Shipsomnia experience recognizable and source-identifying—and created a substantially similar overall commercial impression likely to cause confusion, including reverse confusion, as to source, sponsorship, affiliation, or approval.

## M. Pattern of Inducement, Misappropriation, Sabotaged Investment, and Resulting Harm

85.     Between 2019 and 2025, Plaintiffs presented twelve high-growth venture concepts to Vago and MSC, each marked confidential or submitted under an executed NDA. Throughout this period, Vago repeatedly assured Plaintiffs that agreements would be finalized—including statements such as *"I look forward to receiving the proposal,"* *"Let's proceed with a couple of*

36

*cruises for Shipsomnia,*" "*I'm happy to sign the PO after COVID,*" "*I'll do anything for you,*" "*I'll finance the immersive tech platform and experiential IPs through MSC's marketing budget*" and "*I'm open to any deal as long as it makes sense.*" These assurances induced Plaintiffs to continue disclosing proprietary information and expending significant resources in reasonable reliance on MSC's stated intent to partner.

86.     These assurances were knowingly false. While Vago repeatedly told Plaintiffs that COVID-19 delays prevented MSC from finalizing agreements, MSC simultaneously developed and launched at least six new offerings between 2020 and 2025 that mirrored core elements of Plaintiffs' confidential concepts—including experiential frameworks for onboard venues, narrative structures, and branded thematic environments. None of these offerings had any precedent within MSC's portfolio prior to Plaintiffs' submissions.

87.     A publicly circulated vendor case study later credited Vago as the "creative driver" behind one of these award-winning offerings **(see Exhibit 24)**. The case study made no reference to Plaintiffs, their confidential materials, or their role in originating the underlying concepts. Plaintiffs discovered these misappropriations on or about September 3, 2025, after comparing MSC's released offerings to their own confidential submissions. The same case study notes that MSC drew inspiration from 'esteemed American entertainment giants like Universal and the Walt Disney Company to set world-class standards.' That Disney-caliber expertise was directly present at Plaintiffs' September 17, 2019 Geneva presentation — through Karl Holz, former President of Disney Cruise Line and Chairman and CEO of Disneyland Paris; Joe Lanzisero, former Senior Vice President of Walt Disney Imagineering and designer of the Disney cruise ships, who stated he was 'honored to be part of Shipsomnia's vision'; and Adam Leipzig, former Senior Executive at

Walt Disney Studios and President of National Geographic Films — all of whom endorsed the Shipsomnia IP to Defendant Vago and MSC executives in confidence.

88.     Throughout the relationship, Vago made repeated verbal commitments to approve term sheets, fund marketing activations, and proceed with multi-million-dollar IP integrations—only to withdraw without explanation, "go silent" for weeks or months, or offer shifting pretexts such as the Ukraine conflict. This pattern of inducement followed by abandonment directly sabotaged Plaintiffs' third-party investment opportunities, as multiple investors conditioned capital infusions on MSC's formal participation. This early-stage traction was critical to securing hundreds of millions in institutional capital—something Vago knew throughout the relationship.

89.     As a direct and foreseeable result of Defendants' conduct, Plaintiffs incurred substantial losses, including sunk development costs, loss of commercial momentum, and forfeited equity and business opportunities, as well as the destruction of enterprise value across ventures that were positioned for significant capital formation, strategic partnerships and large-scale commercial deployment, as will be established with precision through expert analysis at trial.

90.     Beginning in early 2020, Vago repeatedly blurred professional boundaries through excessive personal flattery, flirtatious communications, and unsolicited expressions of interest, creating a dynamic in which Plaintiffs reasonably believed his personal attention was tied to MSC's business commitments.

91.     The February 2022 encounters at the Setai marked a turning point, initiating a prolonged pattern of virtual sexual communications through 2025 in which Vago used his authority and Plaintiffs' dependence on MSC's promised partnership to exert coercive influence. His messages included statements such as, "*If you delete intimate photos, I'll stop talking to you,*" and

"*You are my slut, and with you I will do everything,*" demonstrating an escalating abuse of power intertwined with Plaintiffs' ongoing business reliance.

92.     Throughout this period, Maderni continued to engage with Vago because she reasonably believed—based on his repeated promises, his position of authority, and MSC's consistent representations—that the commercial partnerships he described would be executed. The imbalance of power between a global cruise conglomerate and a female startup founder, combined with Vago's persistent assurances, caused her to remain in a dynamic that she later recognized as exploitative. In June 2025, after years of unfulfilled commitments, broken promises, manipulation, and escalating personal misconduct, Maderni terminated all contact.

93.     Vago's conduct—including misrepresentations about business commitments, leveraging MSC's authority to gain personal access, intertwining sexual pressure with professional decision-making, and using emotional manipulation to maintain control—invalidated any purported consent. His actions constituted coercion and abuse of power, causing Maderni profound emotional, psychological, and professional harm.

94.     As a direct and foreseeable result of Defendants' conduct, Plaintiffs suffered substantial damages, including but not limited to: (a) loss of executed and prospective licensing revenues; (b) loss of anticipated revenue-share contracts and commercial opportunities tied to MSC's promised participation; (c) loss of downstream investment capital, as investors conditioned funding on MSC's involvement; (d) destruction of enterprise value across multiple ventures dependent on MSC's participation; (e) misappropriation and commercialization of proprietary intellectual property; (f) unjust enrichment realized by Defendants through the use of Plaintiffs' concepts; and (g) significant reputational, emotional, and professional harm. Plaintiffs believe in good faith that their damages exceed hundreds of millions of dollars and are based, in substantial

part, on the destruction of enterprise value and lost commercial opportunities. A preliminary but-for valuation indicates damages of at least $1.8 billion, subject to expansion and refinement through discovery and expert analysis at trial **(see Exhibit 25)**.

95.    MSC's participation was a critical gating factor for Plaintiffs' ability to secure institutional capital, strategic investment, and commercial partnerships. Defendants were aware that multiple investors and strategic partners conditioned funding decisions on MSC's involvement—consistent with the established venture capital principle that institutional funding follows corporate traction and strategic validation. By inducing reliance and then withdrawing support while simultaneously using Plaintiffs' proprietary materials, Defendants disrupted Plaintiffs' capital formation process, directly impairing their ability to launch and scale their ventures. This resulted in measurable destruction of enterprise value, as will be quantified in Plaintiffs' damages analysis.

**N.  The Expired and Limited Written Confidentiality Agreements; No Contract Claim Is Asserted**

96.    The 2019 NDA was executed by Mad Fresh Entertainment Inc. and MSC Cruises S.A. It had a two-year term and expired by its own terms on September 16, 2021. It was never renewed or extended. Neither Plaintiff Maderni individually, nor Plaintiff Dreamology Labs, nor Defendant Vago in his personal capacity, nor Defendant MSC USA was a party to the 2019 NDA. Mad Fresh made the initial Shipsomnia disclosures to Defendants in 2019 and 2020. Following its incorporation in 2021, Plaintiff Dreamology Labs—which was never a party to the 2019 NDA—itself developed and disclosed additional materials directly to Defendants. Dreamology Labs now owns all of the intellectual property, confidential information, and associated proprietary materials at issue, whether developed and disclosed by Mad Fresh or by Dreamology Labs itself. Plaintiffs'

40

intellectual-property claims arise from Defendants' misappropriation and exploitation of property that Dreamology Labs owns, not from any contractual right under the 2019 NDA.

97.     From September 16, 2021 through October 5, 2023, no confidentiality agreement of any kind was in force between any Plaintiff or Plaintiff-affiliated entity and any Defendant. The parties' relationship nonetheless continued throughout that period: Vago continued to solicit, receive, and internally circulate Plaintiffs' proposals and confidential materials while repeatedly representing that MSC intended to proceed with a partnership.

98.     The most commercially significant of Plaintiffs' disclosures occurred during that period in which no written confidentiality agreement existed, including the Dreamology/Exploraverse platform deck transmitted to Vago on January 31, 2022; the materials discussed at the February 2–3, 2022 meetings at the Setai Hotel in Miami Beach; the February 16, 2022 term sheet; and the updated platform decks and term sheets transmitted in May and June 2022. Each of those disclosures was made in confidence and under circumstances imposing a duty upon Defendants to maintain the secrecy of the materials and to limit their use, based upon the parties' established course of dealing, the confidentiality markings on the materials, Defendants' solicitation of the materials for the stated purpose of evaluating a partnership, and Defendants' prior written acknowledgment of the confidential character of Plaintiffs' information.

99.     On October 5, 2023, Plaintiff Dreamology Labs (doing business as "The Exploraverse") and MSC Cruises S.A. executed a second, separate nondisclosure agreement (the "2023 NDA")—after Vago's office had obtained a printed copy of Plaintiffs' Exploraverse presentation without any protection in place, after Vago withdrew from another promised deal, and only after Maderni insisted upon written protection before MSC would return or destroy confidential material already in its possession. The 2023 NDA covers a different and scaled-down

41

iteration of the platform launch plan. Neither Vago in his personal capacity nor MSC USA is a party to the 2023 NDA.

100.     Plaintiffs assert no claim in this action for breach of the 2019 NDA, the 2023 NDA, or any other contract. No cause of action pleaded in this First Amended Complaint depends upon the interpretation or enforcement of either agreement. The agreements are referenced solely as historical fact, as evidence of the confidential circumstances under which certain of Plaintiffs' disclosures were made and of Defendants' knowledge of the confidential character of Plaintiffs' materials, and as among the reasonable measures Plaintiffs took to protect their trade secrets.

101.     Plaintiffs' claims arise under United States federal statutes—including the Defend Trade Secrets Act, the Copyright Act, the Lanham Act, and the Trafficking Victims Protection Reauthorization Act—and under Florida statutory and common law. Each claim is predicated upon Defendants' fraudulent, tortious, statutory, and coercive misconduct, and upon promises on which Plaintiffs reasonably and detrimentally relied on, not upon the breach of any contractual promise.

**O.  The United States Is the Center of Gravity of This Dispute**

102.     Plaintiffs and their ventures are overwhelmingly based in the United States. Dreamology Labs is a Delaware corporation and U.S.-based venture startup with its principal place of business in Florida; Mad Fresh Entertainment Inc. is also a United States venture startup; Maderni is a lawful permanent resident of the United States and resided in the United States throughout the events giving rise to this action; her co-founder is a United States citizen; and almost all of Plaintiffs' team, advisors, angel investors, and founders—those who suffered the harm alleged herein—are based in the United States.

103.     Plaintiffs' intellectual property and ventures were designed and pitched for launch from the United States market, which is by far the world's largest cruise source market: the United

States accounts for approximately 55% of global ocean cruise passengers, and North America for approximately 60%.

104. The operative misconduct occurred in the United States. The February 2022 sexual misconduct occurred in Miami Beach, Florida. The business meeting at which Vago represented that MSC would finance the Exploraverse platform and related intellectual property through MSC USA's marketing budget occurred in Miami Beach, Florida. The fraudulent representations alleged herein were directed to and received by Maderni in the United States, and the virtual sexual exploitation alleged herein occurred while Maderni resided in the United States.

105. MSC USA participated directly in the events at issue. MSC CEO Gianni Onorato circulated Plaintiffs' proposals to MSC USA's marketing and analytics teams for ROI modeling because the ventures were designed to help MSC gain share in the United States market; Maderni met virtually with Ruben Rodriguez, President of MSC USA, for the same reason; and Vago's February 2022 representations specifically contemplated financing through MSC's marketing budget for the United States market.

106. The accused offerings are commercialized principally in the United States. Three out of the accused offerings alleged herein to be derived from Plaintiffs' materials, operate aboard vessels homeported in the United States: ImaginOcean and the first Pirates Cove Aquapark aboard MSC Seascape (homeported year-round in Galveston, Texas since November 2025, after debuting from Miami in 2022), and the second Pirates Cove Aquapark aboard MSC Seashore (homeported at Port Canaveral, Florida since the winter 2023–24 season, and scheduled to move to Miami in November 2027). Additionally, the BOXES game show is deployed fleetwide across MSC's entire fleet of 23 vessels, and the United States represents MSC's single largest homeport market, with seven ships — the greatest concentration of any country in MSC's global fleet — sailing from US

43

homeports including Miami, Port Canaveral, New York City, and Galveston. These attractions and offerings are marketed and sold to United States consumers through MSC USA.

107.   In October 2023, the Pirates Cove Aquapark received the World Waterpark Association Leading Edge Award at the WWA Symposium & Trade Show in New Orleans, Louisiana. Four companies were publicly associated with the award-winning project— WhiteWater (with United States offices in Longmont, Colorado and San Diego, California), MSC Cruises (with its North American headquarters in Miami, Florida), Amusement Logic, and Life Floor (headquartered in Minneapolis, Minnesota)—while the only company excluded and uncredited, despite owning the underlying concept and intellectual property, was the United States venture startup, Dreamology Labs.

108.   Defendants' United States presence is substantial and growing. MSC developed the world's largest cruise terminal at PortMiami, which serves as MSC USA's principal United States gateway and operations hub — a ribbon-cutting ceremony that Vago personally attended on April 5, 2025. In January 2026, MSC opened a $100 million, 130,000-square-foot North American Cruise Division headquarters in downtown Miami — a ribbon-cutting that Vago personally attended on January 26, 2026.

109.   By contrast, England's connection to this dispute is negligible. One confidential pitch presentation occurred in Geneva; the February 2022 business meeting and misconduct alleged herein occurred in Miami, Florida; additional confidential meetings were conducted virtually with Plaintiffs participating from the United States; and confidential presentations, creative materials, commercialization proposals, and other protected materials were electronically transmitted from the United States to Defendants. None of the trade dress infringement, misappropriation, copyright infringement, fraudulent inducement, or sexual misconduct alleged

herein occurred in England; and none of the individuals identified in this First Amended Complaint resides in England. Apart from the execution of the two confidentiality agreements—upon which no claim herein depends—and a brief 2019 visit to London in the course of travel to the Chantiers de l'Atlantique shipyard in Saint-Nazaire, France, the events giving rise to Plaintiffs' claims have no connection to England. Plaintiffs' Lanham Act, Copyright Act, and Defend Trade Secrets Act claims arise under United States federal law, and the copyright claim is subject to the exclusive jurisdiction of the United States federal courts. This Court is the forum in which Plaintiffs' claims can be adjudicated in full.

**FIRST CAUSE OF ACTION: FRAUDULENT INDUCEMENT (Against All Defendants)**

110.  Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

111.  Beginning in 2019 and continuing through 2025, Defendants—through Vago and MSC executives acting under his authority—made specific material misrepresentations to Plaintiffs, including but not limited to: (a) on or about November 5, 2019, via email, Vago stated, "Look forward to receiving the proposal", representing that MSC intended to proceed with a commercial partnership; (b) On or about November 26, 2019, during meetings and follow-up communications, Vago directed Plaintiffs to prepare a "Shipsomnia chapter proposal for a couple of cruises" for implementation, representing that MSC intended to move forward with pilot programming; (c) throughout 2020 and 2021, Vago repeatedly stated that he was "happy to sign the PO after COVID," representing that execution of agreements was delayed but certain; and (d) on or about February 3, 2022, at the Setai Hotel in Miami Beach, Vago represented that MSC would proceed with financing both the immersive technology platform Exploraverse and its experiential IPs, including a series of Shipsomnia sailings and direct to consumer experiences

through MSC USA's marketing budget. These statements were presented to Plaintiffs as concrete commitments to induce continued disclosure and engagement.

112. At the time these statements were made, Defendants had no present intent to perform. This is evidenced by, among other things, Defendants' contemporaneous development and launch of competing offerings between 2020 and 2022 incorporating Plaintiffs' confidential materials, while continuing to solicit additional disclosures, failing to execute any agreements, and failing to advance the proposals through any identifiable approval or contracting process despite repeated representations that execution was imminent.

113. Defendants made these misrepresentations with the intent that Plaintiffs rely on them, continue investing in the anticipated partnership, continue sharing proprietary information and business plans, and refrain from pursuing alternative partnerships and investment avenues that could have advanced Plaintiffs' ventures.

114. Plaintiffs reasonably and justifiably relied on Defendants' representations. Plaintiffs were repeatedly told that approval was imminent, that delays were temporary and COVID-related, and that Vago personally intended to "sign the PO after COVID" and support multiple projects. Plaintiffs' reliance was further reinforced by MSC's size and reputation, record profits during COVID from the shipping division, the involvement of senior executives across multiple departments, and Vago's uniquely influential position within MSC's leadership and ownership structure.

115. As a direct and proximate result of this reliance, Plaintiffs invested substantial time and resources preparing MSC-specific versions of their concepts, engaged legal and advisory support, paused alternative partnership negotiations, forewent investment opportunities contingent

upon MSC's participation, and continued sharing valuable proprietary information with Defendants.

116.    Plaintiffs suffered substantial damages as a result of Defendants' fraudulent inducement, including but not limited to: loss of multi-million-dollar commercial opportunities; destruction of investor confidence and downstream funding; loss of enterprise value and founder equity; misappropriation of trade secrets and proprietary IP; and accompanying reputational, financial, and emotional harm.

**SECOND CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS (DTSA, 18 U.S.C. § 1836 et seq.) (Against All Defendants)**

117.    Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

118.    Plaintiffs' Trade Secrets include nonpublic compilations, combinations, methods, processes, commercialization strategies, implementation plans, operational know-how, revenue models, venue-integration frameworks, guest-engagement mechanics, activation systems, platform strategies, and confidential business and technical materials developed for Shipsomnia, CulturePunk, Dreamology, Exploraverse, and XploraWorld (collectively, the "Trade Secrets"). These Trade Secrets include, without limitation:

a) proprietary methods and business frameworks for adapting, monetizing, and scaling Plaintiffs' Shipsomnia Chapter IP and immersive story-driven sailings into permanent, scalable, revenue-generating cruise-based attractions, shipboard venues, and onboard experiences;

b) confidential commercialization strategies for adapting Plaintiffs' Chapter IP into cruise-line entertainment products, island activations, onboard venues, and brand-sponsored experiential formats;

c) nonpublic operational designs, guest-flow strategies, guest-engagement mechanics, audience-participation systems, and immersive activation structures designed to increase onboard spending, fare yield, sponsor value, and repeat engagement;

d) confidential narrative-architecture frameworks and thematic sequencing methods used to convert Plaintiffs' story worlds into operational cruise products;

e) proprietary revenue models, partnership structures, rollout plans, pricing strategies, monetization frameworks, and implementation plans for cruise-line deployment;

f) confidential platform architecture and business strategy for the Exploraverse/XploraWorld ecosystem, including brand-partner integrations, loyalty and universal-points mechanics, ESG-linked smart-contract mechanisms, automated cause-allocation structures, and commercial deployment strategies; and

g) confidential compilations of pitch materials, decks, story synopses, implementation plans, forecasts, market opportunities, strategic documents, and related know-how. Plaintiffs do not claim trade-secret protection over generic ideas or public creative themes in isolation, but over the nonpublic combinations, methods, processes, strategies, frameworks, systems, and know-how described above, which constitute protectable trade secrets within the meaning of **18 U.S.C. § 1839(3)**.

119. Certain Trade Secrets, including Plaintiffs' Shipsomnia commercialization strategies, venue-integration frameworks, narrative-architecture methods, guest-flow strategies, and guest-engagement mechanics, were later used and commercialized by Defendants in MSC-branded offerings. Other Trade Secrets, including portions of the Exploraverse/XploraWorld platform architecture, universal-points exchange strategy, ESG-linked smart-contract mechanics,

and brand-partner deployment model, were wrongfully acquired, retained, and solicited by Defendants under false pretenses and remain subject to actual or threatened misuse.

120. Plaintiffs' Trade Secrets derive independent economic value—actual and potential—from not being generally known or readily ascertainable by others who could obtain economic value from their disclosure or use. These Trade Secrets represented years of development, substantial financial investment, and a significant competitive advantage in the entertainment and travel-tech sectors.

121. Plaintiffs took reasonable measures to maintain the secrecy and confidentiality of these Trade Secrets, including marking materials as confidential, limiting disclosure to necessary MSC personnel, disclosing materials only in the context of a partnership evaluation solicited by Defendants and under circumstances imposing an obligation of confidence, maintaining secure internal storage systems, and, during portions of the relevant period, providing materials under written confidentiality agreements. Defendants acquired the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and to limit their use.

122. Defendants obtained Plaintiffs' Trade Secrets through improper means, including fraudulent inducement, misrepresentations regarding anticipated partnerships, and by soliciting increasingly detailed proprietary information under the false pretense that MSC intended to formalize the parties' commercial relationship.

123. Defendants used and disclosed Plaintiffs' Trade Secrets without authorization by incorporating key elements of Plaintiffs' experiential frameworks, narrative structures, thematic designs, and technological integration concepts into MSC's own offerings—including multiple programs launched between 2020 and 2025—and by crediting Vago as the "creative driver" despite MSC having obtained Plaintiffs' materials solely for purposes of partnership evaluation.

49

124. As detailed in Section K (¶¶ 70–77), Defendants did not merely retain Plaintiffs' trade secrets, but commercialized them into discrete, revenue-generating offerings, including multiple onboard theatrical productions, two paid-ticket shows, an award-winning AquaPark attraction deployed across multiple MSC vessels, oversized fish sculptures installed as the central design feature of MSC Virtuosa's main pool deck, and the BOXES interactive game show deployed fleetwide across MSC's entire fleet as part of its kids and family program. These are not conceptual overlaps, but fully deployed commercial products.

125. These offerings incorporate Plaintiffs' confidential experiential frameworks, narrative structures, activation mechanics, thematic sequencing, and monetization models that were disclosed for the limited purpose of evaluating the anticipated partnership. The specificity and execution of these commercialized products demonstrate actual use, not independent development, and constitute misappropriation under 18 U.S.C. § 1839.

126. Defendants' misappropriation is ongoing. Defendants continue to use Plaintiffs' Trade Secrets in active shipboard attractions, venues, entertainment concepts, branded experiences, and revenue-generating offerings aboard MSC vessels. This continuing use causes ongoing harm to Plaintiffs by impairing the secrecy, exclusivity, licensing value, and commercial marketability of Plaintiffs' Trade Secrets, while unjustly enriching Defendants through continued commercial exploitation.

127. Defendants' unauthorized use, disclosure, and retention of Plaintiffs' Trade Secrets occurred in and affected interstate and foreign commerce within the meaning of the DTSA. Plaintiffs transmitted the Trade Secrets electronically across state lines and internationally to MSC's corporate offices.

128.    As a direct and proximate result of Defendants' misappropriation, Plaintiffs suffered substantial damages, including but not limited to: loss of commercial opportunities tied to their proprietary concepts; destruction of market exclusivity; loss of the economic value of their proprietary materials; loss of bargaining position with other prospective partners; sunk development and production costs; loss of enterprise value; lost founder equity; reputational harm; and unjust enrichment realized by Defendants through the commercialization of offerings built on Plaintiffs' Trade Secrets.

129.    Plaintiffs are entitled to compensatory damages, exemplary damages under 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D). Plaintiffs also seek injunctive relief to prevent further use or disclosure of their Trade Secrets.

## THIRD CAUSE OF ACTION: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501) (Against All Defendants)

130.    Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

131.    Plaintiffs are the sole authors and owners of original copyrighted works fixed in tangible form, including but not limited to: written pitch decks, story synopses, scripted entertainment concepts, narrative treatments, audiovisual presentation materials, game-show formats fixed in scripts or written treatments, written and visual platform materials, and immersive storytelling frameworks created for the Shipsomnia and CulturePunk IP and XploraWorld (Exploraverse) platforms (the "Copyrighted Works").

132.    The Copyrighted Works contain original expression, including the selection, coordination, sequencing, narrative structure, thematic progression, character roles, audience-interaction mechanics, visual depictions of platform experiences, user journeys, digital activations,

and experiential entertainment concepts, and are entitled to protection under Title 17 of the United States Code.

133.   Defendants had direct and unfettered access to the Copyrighted Works through confidential submissions, live presentations, printed decks, and electronic transmissions provided by Plaintiffs between 2019 and 2025 at Defendants' solicitation.

134.   As detailed in Section K (¶¶ 70–77), Defendants copied and unlawfully exploited Plaintiffs' protected expression by creating and commercializing multiple entertainment offerings that are substantially similar to the registered Copyrighted Works identified in ¶138 and related protectable expression, including but not limited to: (a) multiple onboard theatrical productions presented in MSC's main theaters, including at least one free-access production; (b) two paid-ticket theatrical entertainment shows offered to passengers for an additional fee; and (c) an award-winning AquaPark attraction deployed across multiple MSC vessels.

135.   These offerings reproduce, adapt, and derive from Plaintiffs' protected expression—including narrative sequencing, specific sequences of narrative events, character archetypes as expressed through defined roles and interactions, thematic architecture and progression, experiential pacing, visual staging, audience-engagement mechanics, and integrated audience participation systems—rather than unprotectable ideas or general concepts.

136.   Defendants' acts constitute copyright infringement under 17 U.S.C. § 501, including unauthorized reproduction, preparation of derivative works, public display, and commercial exploitation of the registered Copyrighted Works identified in ¶138.

137.     Defendants' infringement was willful and knowing. Defendants continued to exploit Plaintiffs' copyrighted expression after years of access, after repeated assurances of partnership, and while withholding attribution or compensation.

138.     Plaintiffs have obtained copyright registrations for certain Copyrighted Works, including Registration Nos. PA 4-306-437, PA 2-585-696, PA 2-585-695, VA 2-511-352, VA 2-511-351, VA 2-511-298, PA 2-593-125, VA 2-512-292, VA 2-512-335, VA 2-512-337, VAu 1-594-585, and TXu 2-552-874. Plaintiffs have also submitted, or are preparing to submit on an expedited basis, registration applications for additional infringed works. Plaintiffs intend to amend this Count pursuant to Federal Rule of Civil Procedure 15 to add additional registration numbers and related allegations as further registrations issue.

139.     This Copyright Infringement claim is presently asserted as to the registered Copyrighted Works identified above and Defendants' infringing uses thereof, without prejudice to Plaintiffs' right to amend this Count to include additional Copyrighted Works once registration issues or as otherwise permitted under 17 U.S.C. § 411(a).

140.     As a direct and proximate result of Defendants' infringement, Plaintiffs have suffered substantial damages, including Defendants' profits attributable to the infringement, Plaintiffs' lost licensing revenue, loss of enterprise value, and reputational harm. Plaintiffs are entitled to all remedies available under 17 U.S.C. §§ 502–505, including injunctive relief, actual damages, Defendants' profits, and, where available, statutory damages, attorneys' fees, and costs.

**FOURTH CAUSE OF ACTION: UNREGISTERED SERVICE TRADE DRESS INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. § 1125(a)(1)(A)**
**(Against All Defendants)**

141.     Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

142.     Plaintiffs own protectable rights in the unregistered Shipsomnia service trade dress described in Section L (¶¶ 78–84), which is distinctive, nonfunctional, and serves to identify Plaintiffs as the source of the Shipsomnia experiential entertainment service.

143.     After obtaining access to Plaintiffs' service trade dress and related materials, Defendants intentionally adopted and used in commerce substantially similar overall presentations in connection with the MSC attractions and entertainment offerings described in paragraphs 70 through 77. Viewed collectively, those offerings appropriated material aspects of the distinctive overall commercial presentation previously implemented through Plaintiffs' proof-of-concept sailings.

144.     Defendants' use of the accused trade dress is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation, approval, or commercial origin of Defendants' entertainment services and is further likely to cause reverse confusion by leading the relevant public to believe that Plaintiffs' Shipsomnia experience originated with, was sponsored by, or is affiliated with MSC.

145.     Defendants acted knowingly and willfully after obtaining direct access to Plaintiffs' prior commercial implementation and presentation of the Shipsomnia service trade dress.

146.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered loss of goodwill, impairment of their commercial identity, diversion of business opportunities, marketplace confusion, and damages in an amount to be proven at trial.

147.     Plaintiffs are entitled to injunctive relief, Defendants' profits, Plaintiffs' damages, costs, attorneys' fees where permitted by law, and all other relief available under 15 U.S.C. §§ 1116 and 1117.

**FIFTH CAUSE OF ACTION: PROMISSORY ESTOPPEL (Against All Defendants)**

148.    Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

149.    Plaintiffs assert this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d). The promises forming the basis of this Count are independent of any written agreement between the parties and concern Defendants' repeated assurances that they would invest in, finance, and commercially launch Plaintiffs' ventures. Those promises were not reduced to an enforceable definitive agreement and are therefore not governed by any express contract.

150.    Beginning in 2019 and continuing through 2025, Defendants—primarily through Vago, acting as Executive Chairman of MSC Cruises—made clear, definite, and repeated promises to Plaintiffs that MSC would take specific commercial actions, including (a) entering into formal agreements with Plaintiffs, (b) funding or co-funding Plaintiffs' experiential IPs and technology platforms, including through allocation of defined marketing budget financing in the tens of millions of dollars, (c) approving submitted term sheets following COVID-related delays, (d) proceeding with the Shipsomnia Chapter to launch a season of sailings and long-term venue integrations, and (e) advancing the Exploraverse platform and production for the Shipsomnia IP as an MSC-supported initiative.

151.    Defendants made these promises with the full knowledge that Plaintiffs would rely on them in continuing to refine, develop, and disclose proprietary concepts and in structuring their business and fundraising strategy around MSC's projected participation.

152.    Plaintiffs did, in fact, reasonably and foreseeably rely on these promises. Plaintiffs invested substantial time, resources, and capital into MSC-specific versions of their concepts; continued to update and deliver confidential pitch decks; refrained from seeking other strategic

55

partners while Defendants represented that MSC approval was imminent; and communicated the expected MSC partnership to advisors and investors who conditioned funding on MSC's involvement.

153. Plaintiffs' reliance on Defendants' promises was reasonable given Vago's role as Executive Chairman, the involvement of multiple MSC executives across departments, the repeated verbal assurances of imminent signing, and the long-running engagement between the parties.

154. Defendants repudiated their promises without warning, justification, or legitimate business rationale, even after inducing Plaintiffs to disclose trade secrets, provide bespoke creative assets, and structure their commercial plans around MSC commitments.

155. Enforcement of these promises is necessary to avoid injustice. Plaintiffs conferred substantial benefits on Defendants, disclosed proprietary information under the expectation of partnership, and suffered severe financial and reputational losses when Defendants abruptly reversed course.

156. As a direct and proximate result of Plaintiffs' reliance on Defendants' promises, Plaintiffs suffered significant damages, including but not limited to: loss of anticipated revenue and contracts tied to MSC's promised participation; loss of investor capital and downstream funding; loss of enterprise value and founder equity; and the derailment of multiple commercial ventures.

157. Plaintiffs are entitled to reliance damages, restitutionary damages, and all other relief necessary to prevent injustice.

56

**SIXTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (Against All Defendants)**

158. Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

159. Plaintiffs had substantial, identifiable, and advantageous prospective economic relationships with third-party investors, venture capital firms, strategic partners, and potential commercial collaborators who had expressed concrete interest in funding or supporting Plaintiffs' ventures—including the Shipsomnia experiential IP and the Dreamology/Exploraverse/XploraWorld technology ecosystem—particularly where such opportunities were contingent upon MSC's participation, endorsement, or execution of the proposed agreements. These relationships included investors engaged in active discussions with Plaintiffs and reviewing materials incorporating MSC as a strategic partner, as well as industry participants evaluating co-production and platform partnerships.

160. Defendants knew of these prospective economic relationships. Plaintiffs informed Vago that multiple investors were prepared to fund Plaintiffs' ventures contingent upon MSC's participation, endorsement, or execution of the proposed term sheets. Defendants were fully aware that MSC's involvement was a material factor in investor decision-making.

161. Defendants intentionally and unjustifiably interfered with these prospective economic relationships by engaging in a pattern of fraudulent inducement, serial misrepresentations, repeated withdrawals of promised agreements, unilateral delays, and abrupt cessation of communications—all while continuing to solicit Plaintiffs' confidential materials. Defendants' conduct created the false appearance of an imminent partnership, thereby misdirecting Plaintiffs into continuing to invest their limited resources, time, and strategic focus into MSC-specific proposals while delaying or forgoing alternative partnerships and capital opportunities.

162.     Defendants' interference was independently wrongful. It included fraudulent inducement, misappropriation of Plaintiffs' trade secrets in violation of the Defend Trade Secrets Act, infringement of Plaintiffs' copyrights and service trade dress, leveraging false promises to induce further disclosures, and retaliatory withdrawal of support immediately after Maderni refused Vago's advances.

163.     Defendants knew, or should have known, that their conduct would foreseeably cause third-party investors to withdraw interest or decline to invest, given that many investors expressly conditioned their funding on MSC's alignment with Plaintiffs' projects.

164.     As a direct and proximate result of Defendants' interference, Plaintiffs lost significant investment opportunities, commercial partnerships, and strategic relationships, resulting in substantial financial harm, including loss of downstream capital, inability to launch or scale ventures timed to market conditions, loss of enterprise value, and reputational harm within the entertainment, technology, and venture capital communities.

165.     Plaintiffs are entitled to recover damages for all losses flowing from Defendants' tortious interference, including lost funding, lost commercial opportunities, lost enterprise value, reputational injury, and any other consequential damages proven at trial.

**SEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT (Against All Defendants)**

166.     Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

167.     Plaintiffs plead this Count in the alternative pursuant to Rule 8(d). No enforceable contract governs the benefits described in this Count, and Plaintiffs assert no contract claim in this action. Defendants have been unjustly enriched by their receipt, retention, and commercial

exploitation of Plaintiffs' intellectual property, proprietary information, trade secrets, creative assets, and business opportunities without providing fair compensation.

168.    Plaintiffs conferred substantial and valuable benefits on Defendants by providing detailed confidential materials, proprietary experiential concepts, storytelling frameworks, technology architectures, business models, pitch decks, strategic proposals, and branded creative assets tailored specifically for MSC's commercial use.

169.    Defendants had full knowledge of these benefits. Plaintiffs disclosed the materials directly to Vago and other MSC executives for the limited purpose of partnership evaluation and in reliance on repeated assurances that MSC intended to formalize a long-term partnership and fund Plaintiffs' ventures.

170.    Defendants voluntarily accepted and retained these benefits. MSC internally circulated Plaintiffs' concepts, incorporated them into its planning documents, and relied on them in developing offerings launched between 2020 and 2025. A publicly circulated vendor case study credited Vago—not Plaintiffs—as the "creative driver" of an experiential award-winning program grounded in Plaintiffs' proprietary submissions.

171.    Defendants' enrichment was not speculative. As detailed in Section K (¶¶ 70–77), MSC realized substantial value by transforming Plaintiffs' proprietary concepts into commercialized, award-winning attractions and productions. These are not conceptual overlaps, but fully deployed commercial products.

172.    Defendants retained the benefits of Plaintiffs' intellectual labor—development cost savings, accelerated time-to-market, enhanced guest engagement, and reputational prestige— under circumstances that make such retention inequitable absent restitution and disgorgement.

173.     Defendants' conduct was inequitable. Plaintiffs provided the proprietary materials in reliance on Defendants' representations of imminent partnership, with the understanding that the materials would be used solely for evaluating the business relationship—not for MSC's unilateral commercial gain. Defendants obtained these benefits through misrepresentations, coercion, abuse of power, manipulation of the parties' relationship, and abuse of the business relationship of trust through which the materials were obtained.

174.     Plaintiffs received no compensation for the substantial value Defendants derived from their work. MSC continued using, referencing, and benefiting from Plaintiffs' proprietary concepts while failing to proceed with agreements, withdrawing promised commitments, and cutting off communications when Maderni resisted Vago's advances.

175.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs suffered significant financial losses, including the value of their misappropriated intellectual property, lost commercial opportunities, diminished market positioning, and erosion of enterprise value.

176.     Equity and good conscience require disgorgement of all benefits Defendants obtained from Plaintiffs' proprietary materials and restitution for the value improperly retained by Defendants.

**EIGHTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against Vago)**

177.     Maderni realleges and incorporates paragraphs 1 through 69 and 85 through 109 as if fully set forth herein.

178.     Defendant Vago engaged in extreme and outrageous conduct, including but not limited to: (a) Vago's sexual assault of Maderni under the guise of a business meeting; (b) his use of professional power, influence, and promises of partnership to create emotional and

psychological leverage over her; (c) his pattern of coercive sexual communications, threats of withdrawing business support, and manipulative behavior; and (d) Vago's retaliatory withdrawal of promised business support and termination of business opportunities immediately following Maderni's resistance to his advances.

179.    This conduct exceeded all possible bounds of decency and is regarded as intolerable in a civilized society. No reasonable person would expect or tolerate a multinational corporation's executive chairman using corporate authority, confidential meetings, NDAs, and the promise of a life-changing commercial partnership to coerce a female founder into sexualized interactions and then retaliate when she resisted, including through the withdrawal of promised commercial support and opportunities.

180.    Vago either intended to cause Maderni severe emotional distress or acted with reckless disregard of the high probability that his conduct would cause such distress. He knowingly exploited his power imbalance, ignored Maderni's verbal objections, used sexual pressure intertwined with business commitments, and repeatedly manipulated her emotional state.

181.    Despite multiple opportunities across six years—including a final invitation through WhatsApp in June-2025 to come forward and explain himself, Vago never provided clarity, accountability, or closure. In her final message, Maderni expressed that she felt deeply used, manipulated, and emotionally discarded, stating: *"All I can think of is that you just used me and took advantage of me without any real care or any genuine intentions."* Rather than respond, Vago once again disappeared. When confronted or pressed to honor his professional commitments or to address the harm caused, he consistently withdrew, delayed, or disappeared. This pattern of ghosting, particularly after securing professional, emotional, or sexual value—was not incidental, but part of a calculated strategy to avoid responsibility while maintaining control.

182.    Vago's conduct caused Maderni profound and ongoing emotional trauma. As a direct and proximate result of Vago's actions, Maderni suffered severe emotional distress, including anxiety, insomnia, humiliation, fear, loss of self-confidence, emotional exhaustion, and professional devastation associated with the collapse of her ventures and the abuse she endured.

183.    The severity of Maderni's distress was foreseeable to Vago, given the power imbalance, the coercive nature of his conduct, and his withdrawal of promised commercial support immediately following the assault.

184.    Plaintiffs are entitled to recovery of all damages allowed under Florida law, including compensatory damages for emotional and psychological harm, consequential damages connected to the distress, and punitive damages due to the intentional and malicious nature of Vago's conduct.

### NINTH CAUSE OF ACTION: SEXUAL BATTERY (Against Vago)

185.    Maderni realleges and incorporates paragraphs 1 through 69 and 85 through 109 as if fully set forth herein.

186.    On or about February 2–3, 2022, Defendant Vago intentionally touched and penetrated or attempted to penetrate intimate parts of Plaintiff Maderni's body for the purpose of sexual gratification, without her freely given consent. Vago's conduct constituted sexual battery under Florida common law and contravened the standard of conduct codified in Fla. Stat. § 794.011, under which consent means "intelligent, knowing, and voluntary consent," does not "include coerced submission," and "shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender."

187.    Vago obtained this physical contact through fraud, coercion, and abuse of power. He used the pretext of a business meeting, his role as Executive Chairman of MSC Cruises, and

the promise of advancing Plaintiffs' multi-million-dollar commercial partnership to isolate Maderni in a private hotel suite, override her verbal objections, and exploit the extreme power imbalance between them.

188.    Vago's conduct occurred in a context where Maderni reasonably believed that refusing his advances could jeopardize ongoing business negotiations, the success of her company, and years of work invested in the MSC partnership. Any purported "consent" was therefore invalid under Florida law because it was obtained through fraud, coercive circumstances, manipulation, and abuse of authority.

189.    Vago's actions constituted harmful, offensive, and nonconsensual sexual contact that a reasonable person would find violative of personal dignity and bodily autonomy.

190.    As a direct and proximate result of the sexual battery, Maderni suffered severe emotional distress, including trauma, anxiety, humiliation, fear, loss of safety, and long-term psychological harm. She also suffered professional and reputational injury due to Vago's immediate withdrawal from his business commitments.

191.    Vago's conduct was intentional, willful, malicious, and in conscious disregard for Maderni's rights and bodily integrity, entitling Plaintiffs to punitive damages under Florida law.

192.    Maderni seeks compensatory damages, punitive damages, and all other relief available under statute and equity.

193.    This claim is timely. On December 26, 2025, Plaintiffs and Defendants—including Defendant Vago in his individual capacity—entered into a tolling agreement, effective on that date, tolling all applicable statutes of limitation and other time-based defenses relating to the disputes described in Plaintiffs' December 19, 2025 demand letter and draft complaint for a period of one

hundred twenty (120) days, through April 25, 2026. No event terminated the tolling period prior to its expiration.

194.   At the commencement of the tolling period on December 26, 2025, no fewer than thirty-nine (39) days remained on the four-year limitations period applicable to this claim under Fla. Stat. § 95.11(3)(n). Upon expiration of the tolling period, the limitations period resumed running on April 26, 2026, and did not expire until at least June 3, 2026. This action was commenced on June 2, 2026, within the limitations period as tolled.

**TENTH CAUSE OF ACTION: CIVIL SEX TRAFFICKING (18 U.S.C. § 1595) (Against Vago)**

195.   Maderni realleges and incorporates paragraphs 1 through 69 and 85 through 109 as if fully set forth herein.

196.   Under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, a person is civilly liable if he knowingly benefits, financially or by receiving anything of value, from participation in a venture that has engaged in the use of force, threats of force, fraud, or coercion to obtain commercial sex acts or sexual contact.

197.   Beginning in 2020 and continuing through February 2022, Vago knowingly used fraud, coercion, manipulation, abuse of professional authority, excessive flattery, blurred professional boundaries, and false promises of commercial partnership to build trust and dependency and ultimately obtain sexual acts from Maderni at the Setai Hotel in February 2022. These tactics included: (a) representing that MSC would sign deals "after COVID," (b) promising to fund Plaintiffs' ventures through marketing budgets, (c) leveraging his position as Executive Chairman to imply that her company's success depended on maintaining intimacy with him, and (d) isolating her during what was represented as a business meeting for the purpose of obtaining sexual contact. From 2023 through 2025, Vago continued to derive sexual gratification from the

same coercive dynamic through sexually charged text messages and video calls conducted via Facebook Messenger and WhatsApp. During one such video call, as part of this broader pattern, Vago linked explicit sexual conduct to promised access to other cruise-line CEOs whom he said he would bring to Plaintiffs' platform, reinforcing the commercial nature of the coercive dynamic. The sexual acts and interactions described herein were not purely personal in nature, but constituted commercial sex acts within the meaning of 18 U.S.C. § 1591, in that access to the business opportunities, funding, and partnership advancement that Vago promised and controlled was implicitly conditioned on Maderni's participation in such conduct, as evidenced by Vago's course of conduct, repeated linkage between personal interactions and business advancement, and exploitation of a significant imbalance of economic and professional power.

198. Over time, Maderni began to recognize and articulate the depth of the exploitation. In one message, she told Vago, "You treated me worse than a cam girl. At least they get paid," expressing the emotional toll of having been used for sexual gratification, emotional labor, and creative value without any genuine commitment or compensation. Vago's own messages revealed the coercive nature of the dynamic, including statements like, "You want me to come to you? Then?! Resend [content]," and, "I'm going to jerk off thinking exactly about this." These communications reflect a calculated use of emotional manipulation and conditional attention, designed to control and exploit Maderni while evading accountability.

199. Vago knowingly benefited from participation in this venture, within the meaning of 18 U.S.C. § 1595, by obtaining sexual access to Maderni and securing continued access to her emotional, professional, and creative labor, as well as her proprietary intellectual property, under coercive conditions tied to promised commercial advancement, where she believed her commercial future with MSC depended on complying with his personal expectations.

200.    The benefits Vago derived from this conduct extended well beyond sexual access. Through fraud, coercion, and abuse of power, he obtained continued access to Maderni's emotional, professional, and creative labor, together with non-public market intelligence, proprietary creative concepts, and confidential materials—shared in confidence and in reliance on false promises of partnership. This exploitation exacerbated Maderni's harm and underscores the scale of Vago's misconduct.

201.    Vago is liable under 18 U.S.C. § 1595 as a perpetrator of violations of 18 U.S.C. § 1591. In addition, and in the alternative, the "venture," as defined under the TVPRA, consisted of an ongoing and coordinated course of conduct in which Vago, acting in concert with others and exploiting the corporate authority and commercial opportunities under his control, repeatedly used promises of commercial advancement, ongoing communications, requests for confidential materials, and scheduled meetings to obtain sexual acts and maintain control over Plaintiffs' business trajectory. This venture involved a pattern of related activities conducted over time with a common purpose of extracting both sexual and economic value from Plaintiffs.

202.    Vago used fraud and coercion—including misrepresentations, abuse of power, exploitation of a significant professional imbalance, and threats (express or implied) that refusal could jeopardize business opportunities—to cause Maderni to engage in sexual acts she would not have otherwise engaged in, and that such dependency was directly tied to Vago's representations regarding imminent commercial agreements and financial support.

203.    At the time of the February 2022 sexual encounters at the Setai Hotel, Vago knew that Maderni felt dependent on his support for the survival and scaling of her company. He leveraged this dynamic to obtain sexual contact in violation of 18 U.S.C. § 1591(a).

204. Vago's conduct falls squarely within the TVPRA's definition of sex trafficking through fraud, coercion, and abuse of power, all of which invalidate consent under federal law. His actions were intentional, calculated, and part of a prolonged effort to maintain control over Maderni's emotional, professional, and sexual autonomy, including by conditioning access to economic opportunities and business advancement on continued participation in sexual conduct.

205. As a direct and proximate result of Vago's sex-trafficking conduct, Maderni suffered severe emotional and psychological harm, including trauma, anxiety, humiliation, diminished professional confidence, and lasting psychological injury. She also suffered commercial harm due to the retaliatory withdrawal of partnership opportunities that followed.

206. Maderni is entitled to all civil remedies available under 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and all other relief deemed just and proper by this Court.

**ELEVENTH CAUSE OF ACTION: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c)) (Against Vago)**

207. Plaintiffs reallege and incorporate paragraphs 1 through 109 as if fully set forth herein.

208. Defendant MSC Cruises S.A. and Defendant MSC USA, together with their affiliated operating, marketing, analytics, and product-development units and personnel (collectively, the "MSC Enterprise"), constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). The MSC Enterprise is an ongoing organization with a decision-making structure and defined functions—executive leadership, product development, guest experience, marketing, and United States sales and distribution—that functions as a continuing unit, and its activities are engaged in and affect interstate and foreign commerce, including the marketing and sale of cruise entertainment to United States consumers through MSC USA.

209.    Defendant Vago is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). As a natural person, Vago is distinct from the MSC Enterprise, notwithstanding his position as its Executive Chairman.

210.    Vago conducted and participated, directly and indirectly, in the conduct of the MSC Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Among other things, Vago personally solicited Plaintiffs' proprietary materials on the Enterprise's behalf; transmitted and directed the transmission of false assurances of partnership to induce continued disclosures; caused Plaintiffs' materials to be circulated within the Enterprise for evaluation, ROI modeling, and product development; and personally directed the incorporation of Plaintiffs' proprietary creative expression into Enterprise offerings, including his directive to the Pirates Cove Aquapark design team to abandon its space theme in favor of the pirate-ship-and-Kraken theming Plaintiffs had disclosed to Defendants as protected proprietary material (¶ 74).

211.    *Predicate acts—theft of trade secrets (18 U.S.C. § 1832).* From 2019 through the present, Vago repeatedly and without authorization appropriated, copied, transmitted, received, and used, and caused others within the MSC Enterprise to appropriate, copy, transmit, receive, and use, Plaintiffs' trade secrets—which relate to services used in and intended for use in interstate and foreign commerce—for the economic benefit of persons other than Plaintiffs, intending and knowing that the offense would injure Plaintiffs, in violation of 18 U.S.C. § 1832. These predicate acts include, without limitation, each unauthorized internal reproduction and circulation of Plaintiffs' proprietary materials (¶¶ 27, 65, 68, 105) and each continuing act of unauthorized commercial use of Plaintiffs' trade secrets in the development, deployment, and operation of Chronicles, Arkymea, ImaginOcean, the Pirates Cove Aquapark installations, the Atmosphere Pool

Fish Sculptures, and BOXES (¶¶ 70–77). Each such use is a discrete predicate act, and such acts are continuing today aboard MSC vessels in active commercial service.

212.    *Predicate acts—wire fraud (18 U.S.C. § 1343).* Vago devised and executed a scheme to defraud Plaintiffs of money and property—including their trade secrets, intellectual property, creative labor, and business opportunities—through materially false representations of MSC's intent to partner, and transmitted or caused to be transmitted by interstate and foreign wire communications writings and signals in furtherance of that scheme, including without limitation: (a) the November 5, 2019 email stating "Look forward to receiving the proposal" (¶ 25); (b) the 2020–2021 electronic communications representing that Vago was "happy to sign the deal after COVID" (¶ 29); (c) the February 2022 communications at and following the Miami meetings, including the representation that MSC would finance the Exploraverse platform and Shipsomnia sailings through MSC USA's marketing budget (¶¶ 33–35); (d) the March 15, 2022 Facebook Messenger message advancing the pretextual Ukraine explanation (¶ 36); (e) the 2023 re-engagement communications inducing further disclosures (¶¶ 46–52); and (f) the September 2023 through March 2025 electronic communications dangling renewed business commitments (¶ 53). At the time of each transmission, Vago had no present intent that MSC would perform, as evidenced by the Enterprise's contemporaneous development and commercialization of offerings derived from Plaintiffs' materials.

213.    *Relatedness.* The predicate acts are related within the meaning of RICO: they shared the same or similar purposes (extracting Plaintiffs' proprietary value without payment while forestalling Plaintiffs' alternatives), results, participants, victims, and methods of commission, and were interrelated by distinguishing characteristics rather than isolated events.

214.     *Continuity.* The predicate acts demonstrate criminal conduct of a continuing nature. Closed-ended continuity exists because the predicates extended continuously over more than six years (2019 through 2025) and comprised multiple distinct schemes inflicting distinct injuries, including (i) the misappropriation and commercialization of the Shipsomnia trade secrets and creative assets into at least six separate revenue-generating offerings, each a distinct injury (¶¶ 70–77); (ii) the separate scheme to extract the Exploraverse/XploraWorld platform architecture, universal-points-exchange strategy, and related market intelligence; and (iii) the serial inducement of at least twelve distinct venture disclosures through repeated false assurances (¶ 85). Open-ended continuity exists independently because the Enterprise's unauthorized use of Plaintiffs' trade secrets is ongoing in active, fleetwide commercial attractions—conduct that continues to impart new injury rather than merely conceal past wrongdoing—and because the predicate conduct reflects the Enterprise's regular way of developing entertainment products from misappropriated third-party concepts, threatening repetition.

215.     As a direct and proximate result of Vago's violation of 18 U.S.C. § 1962(c), Plaintiffs suffered injury to their business and property by reason of the predicate acts, including the value of the misappropriated trade secrets and creative assets, sunk development and production costs, and lost licensing and revenue-share income from the accused offerings, together with consequential losses including the withdrawal of conditioned investor capital and destruction of enterprise value. Plaintiffs' injuries were suffered in the United States, principally in Florida, and constitute domestic injuries.

216.     Plaintiffs are entitled to threefold their damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**TWELFTH CAUSE OF ACTION: RICO CONSPIRACY (18 U.S.C. § 1962(d)) (Against All Defendants)**

217. Plaintiffs reallege and incorporate paragraphs 1 through 109 and 208 through 215 as if fully set forth herein.

218. Defendants Vago, MSC Cruises S.A., and MSC USA knowingly agreed to the objective of conducting the MSC Enterprise's affairs through a pattern of racketeering activity, and each Defendant agreed that a conspirator would commit at least two predicate acts in furtherance of that objective, in violation of 18 U.S.C. § 1962(d).

219. The agreement is evidenced by facts independent of the substantive violation, including without limitation: (a) Vago's personal directive to the Pirates Cove design vendor to incorporate the Kraken theming Plaintiffs had disclosed to Defendants as protected proprietary material (¶ 74); (b) CEO Gianni Onorato's receipt of Plaintiffs' proposals from Vago and his circulation of them to MSC USA's marketing and analytics teams (¶¶ 27, 65, 105); (c) MSC USA's performance of ROI modeling on those proposals and its subsequent marketing and sale of the accused offerings to United States consumers (¶¶ 27, 105); (d) the internal printing and retention of Plaintiffs' proprietary Exploraverse presentation without contractual protection, followed by in-house counsel's insistence on new terms before its return (¶¶ 68, 97–99); (e) Vice President Trevor Young's presence at the 2019 Kraken disclosure and his subsequent public celebration of the commercialized Kraken tentacles as bringing the park's story to life (¶ 60); and (f) executive Marco Ottaviani's communication, at Vago's direction, of the Enterprise's withdrawal from the XploraWorld partnership after the Enterprise had extracted the underlying market intelligence (¶ 69).

220. Each Defendant knew the essential nature and scope of the scheme and intended to participate in it: the corporate Defendants accepted, evaluated, retained, and commercialized

71

materials they knew had been obtained through Vago's false assurances of partnership and contrary to the protected proprietary basis on which they were disclosed.

221.   As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered injury to their business and property as alleged in paragraph 215, and are entitled to threefold their damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows: on the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Twelfth Causes of Action, against all Defendants according to their respective liability as pleaded in each Count; on the Eighth, Ninth, and Tenth Causes of Action, in favor of Plaintiff Maderni and against Defendant Vago individually; and on the Eleventh Cause of Action, in favor of Plaintiffs and against Defendant Vago:

1. **Compensatory damages** in an amount to be proven at trial, including damages for economic loss, loss of enterprise value, emotional distress, reputational harm, and all other legally cognizable injuries;

2. **Treble damages** as authorized under 18 U.S.C. § 1964(c);

3. **Exemplary and punitive damages** to punish and deter Defendants' willful, malicious, fraudulent, and coercive conduct, including exemplary damages available under 18 U.S.C. § 1836(b)(3)(C);

4. **Restitution and disgorgement** of all benefits, profits, or enrichment Defendants obtained from Plaintiffs' trade secrets, copyrighted works, service trade dress, other intellectual property, and labor;

5. **An Accounting** of all revenues, profits, savings, benefits, and commercial value derived from Defendants' use, disclosure, retention, or exploitation of Plaintiffs' trade secrets,

copyrighted works, service trade dress, and other intellectual property and proprietary materials;

6. **Preliminary and Permanent Injunctive relief** prohibiting Defendants from using, disclosing, retaining, or exploiting Plaintiffs' trade secrets, copyrighted works, service trade dress, or other intellectual property, and requiring return or verified destruction of all copies in any form, as authorized by 18 U.S.C. § 1836(b)(3)(A) and 17 U.S.C. § 503;

7. **Attorneys' fees and costs** pursuant to 18 U.S.C. § 1836(b)(3)(D), 17 U.S.C. § 505, 18 U.S.C. § 1964(c), and all other applicable statutes, contracts, or legal bases;

8. **Pre-judgment and post-judgment interest** at the maximum rates permitted by law;

9. **Such other and further relief** as the Court deems just, proper, and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

**Dated:** July 14, 2026

Respectfully submitted,

/s/ Andrew M. Green
Andrew M. Green
Florida Bar No. 1058045
**LAW OFFICES OF BARRY M. WAX**
701 Brickell Avenue, Suite 1550
Miami, Florida 33131
(305) 373-4400
agreen@barrywax.com

/s/ John M. Pierce
John M. Pierce (California Bar No. 250443)
(*Pro Hac Vice Application to be Submitted*)
John Pierce Law P.C.
21550 Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
(321) 292-2366
jpierce@johnpiercelaw.com

*Counsel for Plaintiffs*

73

# EXHIBIT 1

**From:** Vago Pierfrancesco <pfv@msccruises.com>
**Date:** August 7, 2019 at 5:44:54 AM GMT-4
**To:** Karl Holz <karl@karlholzadvisorsllc.com>
**Cc:** Pierfrancesco Vago <pfvago@mscgva.ch>
**Subject: Re: Shipsomnia...**

Hi Karl
Nice hearing from you.
Indeed I'm so sorry we could not carry on with our exciting association endeavours but I do agree with you that there might be more interesting things out there.
Thank you so much for the below intro .
I do agree with you that such experience will definitely fit in with the segmentation of our targeted clientele.
In fact I'm very interested if we could organise a meeting either in London or in Geneva but sooner  rather then later as we are finalising all our prototypes.
Should I call you later?

Best Regards

Pierfrancesco Vago
Executive Chairman
MSC Cruises

# EXHIBIT 2



**SHIPSOMNIA**

Alessandra Maderni <ale@madfreshentertainment.com>

## Shipsomnia Introduction

25 messages

**Karl Holz** <karl@karlholzadvisorsllc.com>                        Sun, Sep 1, 2019 at 2:52 PM
To: Maderni Alessandra <ale@madfreshentertainment.com>

Greetings Vago,

Prior to the September 17th Shipsomnia meeting in Geneva, I wanted to tell you about the team you'll be meeting.  They are an extraordinarily talented trio, and I think you'll enjoy getting to know them.  You will find their photos at the end of this email.  So...

**Alessandra Maderni** is the CEO and Co-Founder of Shipsomnia. I met her in Florida and was really impressed with her vision and business acumen. She is a serial entrepreneur in various sectors of the entertainment industry from opening nightclubs at a very young age to conceptualizing themed festivals for global brands and even designing and building the largest entertainment complex in South East Asia… She is half Italian and half Thai, born and raised in Rome and speaks both languages and English natively.

**Jay Slangen** is the Chief Creative executive and the other Co-Founder of Shipsomnia. He has worked alongside Alessandra for over ten years. He comes from a background in the travel industry having been Creative Director for the world's biggest high school travel operator, Rustic Pathways.  He's a brilliant creative mind with talents across multiple disciplines including graphic design, videography, marketing, event production, and storytelling.

**Adam Leipzig**, like me, Is a former Disney guy. He was a senior executive at Walt Disney Studios and later became the President of National Geographic Films. He's built and operated theaters, produced more than 300 live productions, and made more than 30 movies – including some classics like *Dead Poets Society, Honey I Shrunk the Kids,* and *March of the Penguins*. Ask him to tell you about shooting *Titus* in Rome with Anthony Hopkins, and his recent documentary *A Plastic Ocean,* about a subject we all care so much about, that has had a global impact and was invited to screen at the United Nations.

Shipsomnia is a far cry from the normal "run of the mill" entertainment found on cruise lines.  Shipsomnia is an immersive, all-encompassing event experience that can live for the life of the cruise.  It is an intense delight for the senses that enables cruises to be a part of the show.  It is something that cannot be compared to the hour long variety shows typically found on cruise ships.  I know that the Shipsomnia team looks forward to speaking to you and your key staff about doing something truly special on MSC.

I should also let you know that since we first discussed this concept, I've joined their team as an overall business advisor.  From my perspective, this has the opportunity to be hugely successful and even more fun!  Let me know if you would like to have a call before the meeting. Shipsomnia is a breakthrough concept and opportunity, and I'd like to help pave the way for the possible future relationship.

Best,

Karl

The team going to Geneva: Alessandra, Jay and Adam:



# EXHIBIT 3



**SHIPSOMNIA**

Alessandra Maderni <ale@madfreshentertainment.com>

---

### Shipsomnia Introduction

**Brian Mac Mahon** <brian@expertdojo.com>       Mon, Sep 2, 2019 at 8:20 PM
To: Alessandra Maderni <ale@madfreshentertainment.com>

I will get on the investor trail....

B

Brian Mac Mahon
Sensei
Expert DOJO
Unit 308, 395 Santa Monica Place,
Santa Monica, CA, 90401
3107459580
www.expertdojo.com
brian@expertdojo.com

Apply for a 15 minute Pitch to Expert DOJO for our Accelerator, Venture Studio or Growth Studio

Apply to host an event at Expert DOJO

Watch my TEDx talk about entrepreneurship

Here is our link to the Expert DOJO Investor Podcast - Vital for Startups to hear

[Quoted text hidden]

---



**SHIPSOMNIA**

Alessandra Maderni <ale@madfreshentertainment.com>

---

### Shipsomnia Introduction

**Brian Mac Mahon** <brian@expertdojo.com>       Sat, Sep 14, 2019 at 12:12 PM
To: Alessandra Maderni <ale@madfreshentertainment.com>
Cc: Jonathan Wallace <jon@expertdojo.com>

Break a leg.  I will hook up Warner when you are back.

Be you and come back with the boats...

B

Brian Mac Mahon
Sensei
Expert DOJO
Unit 308, 395 Santa Monica Place,
Santa Monica, CA, 90401
3107459580
www.expertdojo.com
brian@expertdojo.com

Apply for a 15 minute Pitch to Expert DOJO for our Accelerator, Venture Studio or Growth Studio

Apply to host an event at Expert DOJO

Watch my TEDx talk about entrepreneurship

Here is our link to the Expert DOJO Investor Podcast - Vital for Startups to hear

[Quoted text hidden]

# EXHIBIT 4

## CONFIDENTIALITY AGREEMENT

**BETWEEN**

**MSC Cruises S.A.**, a company incorporated under the laws of Switzerland with registered offices in Geneva (1206), Switzerland, Avenue Eugène-Pittard 40;

Hereinafter referred to as **"MSC"**

**AND**

**MAD FRESH ENTERTAINMENT INC. DBA SHIPSOMNIA** of 13900 Panay Way APT-R118, Marina del Rey California 90292

Hereinafter referred to as **"[MAD FRESH]"**

MSC and MAD FRESH may also be referred to individually as **"Party"** and collectively as **"Parties"**.

**RECITALS:**

Whereas the Parties are evaluating a potential partnership (the **"Possible Project"**) and wish to enter into discussions regarding the Possible Project.

Whereas the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to each other some Confidential Information (as defined below) in relation to the Possible Project (as defined above).

**THE PARTIES AGREE AS FOLLOWS:**

**1.     Definitions**

In this Agreement:

**"Affiliated Company"** shall mean for a Party any company or legal entity which Controls such Party, or is Controlled by such Party, or is Controlled by an entity that Controls such Party. "Control" means having the right to direct the management and policies of an entity, whether through the ownership directly or indirectly of more than 50 percent of the voting rights, by contract or otherwise.

**"Confidential Information"** means any and all information (whether marked confidential or otherwise) including but not limited to data, reports, records, correspondence, notes, compilations, studies, forecasts, analyses, renderings, sketches, trade secrets, operations, processes, plans, intentions, product information, prices, know-how, designs, customer lists, market opportunities, transactions, affairs and/or business of the Disclosing Party and/or its Affiliates, and/or relating to their respective directors, officers, employees, shareholders, customers, suppliers, clients, analysts, consultants, business associates or Affiliates in or on any medium or format, whether in writing or oral, whether disclosed and/or obtained prior to, on, or after the date of this Agreement, for the purpose of, or in the course of, considering, negotiating, advising or furthering the Possible Project. Confidential Information in all cases excludes information that:

(i)     is already in the public domain or enters the public domain other than through the act or omission of the Receiving Party; or

(ii)    can be demonstrated to be already known by the Receiving Party before the date the information is disclosed to the Receiving Party by the Disclosing Party or is lawfully obtained by the Receiving Party from a third party which, as far as the Receiving Party is aware, is not otherwise subject to any obligation of confidentiality; or

(iii)   is independently developed by the Receiving Party without reference to, use of or access to the Confidential Information of the Disclosing Party, as evidenced by its written records.

**"Disclosing Party"** means the Party who provides Confidential Information to the other Party.

**"Group"** means a Party and its Affiliated Companies.

**"Permitted Purpose"** means considering and evaluating of the Possible Project.

**"Receiving Party"** means the Party who receives Confidential Information from the other Party.

1

**2. Confidentiality Undertaking**

2.1 In consideration of the Disclosing Party agreeing to make available Confidential Information, the Receiving Party hereby undertakes to the Disclosing Party:

    (a) to keep the Confidential Information confidential and not to disclose it to anyone except as provided for by clause 3 below and to ensure that the Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information;

    (b) to keep confidential and not disclose to anyone the fact that the Confidential Information has been made available or that discussions or negotiations are taking place or have taken place between the Disclosing Party and the Receiving Party (and the status or terms of such discussions) in connection with the Possible Project; and

    (c) to use, and permit the use of, the Confidential Information only in connection with the Permitted Purpose.

2.2 The Disclosing Party hereby represents and warrants that it has the right and authority to disclose the Confidential Information to Receiving Party on the terms of this Agreement. The Disclosing Party makes no representations or warranties, express or implied, as to the quality, accuracy and completeness of the Confidential Information. Absent fraud, wilful misconduct or bad faith, the Disclosing Party and the other members of its Group, their respective officers, directors and employees shall have no liability whatsoever regarding the use of or reliance upon the Confidential Information by the Receiving Party.

2.3 The Receiving Party shall acquire no proprietary interest in or rights to the Confidential Information.

**3. Permitted Disclosure**

3.1 The Receiving Party may disclose the Confidential Information:

    (a) without the Disclosing Party's prior written consent, to members of the Receiving Party's Group and their officers, directors, employees on a "need to know" basis to carry out the Permitted Purpose;

    (b) without the Disclosing Party's prior written consent, to any professional consultant, auditor or advisor (including legal advisor) engaged by the Receiving Party in order to carry out the Permitted Purpose;

    (c) without the Disclosing Party's prior written consent and only to the extent necessary for the Permitted Purpose, to any investor, potential partner, insurance company or bank funding or proposing to participate in the Possible Project, including any professional consultant retained by such person;

    (d) without the Disclosing Party's prior written consent (i) where requested or required by any court of competent jurisdiction or any competent judicial, governmental, supervisory or regulatory body, (ii) where required by the rules of any stock exchange on which the shares or other securities of any member of the Receiving Party's Group are listed or (iii) where required by the laws or regulations of any country with jurisdiction over the affairs of any member of the Receiving Party's Group; or

    (e) with the prior written consent of the Disclosing Party.

3.2 Prior to making any such disclosure to persons under paragraph (b) and (c) above, the Receiving Party shall obtain an undertaking of confidentiality, in substantially the same form and content as this Agreement, from each person save in the case of outside counsel who are subject to professional obligations to maintain the confidentiality of the Confidential Information.

The Receiving Party shall be responsible for ensuring that all persons to whom the Receiving Party discloses the Confidential Information under this Agreement shall keep such information confidential and shall not disclose or divulge the same to any unauthorized person.

3.3 A Party may be irreparably harmed by any breach of the terms of this Agreement and that damages alone may not necessarily be an adequate remedy; accordingly, the Receiving Party hereby acknowledges that the Disclosing Party shall be entitled to immediate injunctive relief, specific performance and other equitable relief in the event of any breach of the terms of this Agreement.

3.4 The liability of the Parties to each other for breach of this Agreement shall be limited to direct actual damages only. Such direct actual damages shall be the sole and exclusive remedy, and all other remedies or damages at law or in

2

equity are waived except such equitable relief as may be granted under Article 3.3. In no event shall the Parties be liable to each other for any other damages, including loss or deferment of revenue or profits or loss of opportunity or any incidental, indirect, consequential, special, or punitive damages, regardless of negligence or fault.

**4.    Notification of Required or Unauthorised Disclosure**

4.1    The Receiving Party will make all reasonable efforts (to the extent permitted by law) to inform the Disclosing Party (i) of any disclosure under clause 3.1(d) and to the extent permitted by law to seek the Disclosing Party's approval regarding the content of such disclosure or (ii) upon becoming aware that Confidential Information has been disclosed in breach of this Agreement.

4.2    For the avoidance of doubt, nothing in this Agreement shall prevent the Disclosing Party from seeking a protective order or other legal measures to prevent or restrict the extent of disclosure the Receiving Party may be required to make pursuant to Clause 3.1(d).

**5.    Return/Destruction of Copies**

5.1    If the Disclosing Party so requests in writing, the Receiving Party shall either return or destroy (choice between return and destruction at the option of the Receiving Party) within 20 days of such written request all Confidential Information and permanently erase all copies in its possession and use all reasonable endeavours to ensure that anyone to whom the Receiving Party has supplied any Confidential Information pursuant to paragraphs (a), (b), (c) and (e) of Clause 3.1 destroys such Confidential Information and permanently erases any copies made by them, provided that the Receiving Party or the said recipients may retain any such Confidential Information subject to the provisions of this Agreement (i) where required by any applicable law, rule or regulation or by any competent judicial, governmental, supervisory or regulatory body or in accordance with internal policy, or (ii) where the Confidential Information has been disclosed under clause 3.1(d) above, or (iii) where such Confidential Information has been stored in the Receiving Party's electronic back-up systems pursuant to the automated and routine back-up procedure generally applicable to all the Receiving Party's electronic data if the Confidential Information will be destroyed in accordance with the regular ongoing records retention process of Receiving Party or such person and if the Confidential Information is not used prior to its destruction.

5.2    If requested in writing by the Disclosing Party, the Receiving Party shall provide an official certificate to the Disclosing Party to the effect that the foregoing terms and conditions of this clause have been complied with.

**6.    Term**

This Agreement shall terminate on the earlier of: i) the date the Receiving Party and the Disclosing Party enter into a binding agreement in relation to the Possible Project which contains obligations of confidentiality, ii) 2 years after the date of this Agreement; or ii) 12 months after the Receiving Party notify the Disclosing Party it has returned or destroyed all Confidential Information supplied to the Receiving Party by the Disclosing Party and destroyed and permanently erased all copies of Confidential Information made by it (other than any such Confidential Information or copies which have been disclosed under clause 3.1(d) above or which, pursuant to clause 5 above, are not required to be returned or destroyed).

**7.    No Partnership and Acknowledgements**

7.1    Entering into this Agreement and disclosing and receiving the Confidential Information will not commit either Party to enter into any further contract in connection with the Possible Project, or any other product or service to which the Confidential Information relates. This Agreement shall not constitute nor should it be construed to constitute an offer or commitment to proceed with the Possible Project.

7.2    The decision of a Party to proceed with the Possible Project is within the absolute discretion of such Party and unless and until mutually agreed definitive and legally binding written and executed agreements are entered into by the Parties with respect to the Possible Project, no duty of any kind (other than the obligations of confidentiality pursuant to this Agreement) is owed by a Party to the other Party in connection therewith and each Party shall be entitled to withdraw from discussions relating to the Possible Project without liability of any kind to the other Party, provided that the terms of this Agreement are otherwise complied with.

7.3    Nothing in this Agreement is intended to, or shall be deemed to, establish any partnership or joint venture between the Parties, constitute any Party the agent of another Party, or authorise any Party to make or enter into commitments for, or on behalf of the other Party.

**8.    No Waiver; Amendments**

No failure or delay in exercising any right, power or privilege under this Agreement will operate as a waiver thereof nor will any single or partial exercise of any right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or privileges under this Agreement. This Agreement may only be amended or modified by written agreement between the Receiving Party and the Disclosing Party.

**9.    Third Parties' Rights**

Nothing in this Agreement shall be considered or construed as conferring any right or benefit on a person not a party to the Agreement and the Parties do not intend that any term of the Agreement should be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to the Agreement.

**10.    Governing Law**

This Agreement shall be governed by, and construed in accordance with, the laws of England and Wales but without reference to any conflict of law rules.

**11.    Jurisdiction**

The High Court sitting in London shall have exclusive jurisdiction to settle any dispute arising out of or relating to this Agreement, including non-contractual disputes or claims, any question regarding its existence, validity or termination.

**12.    Entire Agreement**

This Agreement comprises the full and complete agreement of the Parties regarding the disclosure of Confidential Information and supersedes and cancels all prior communications, understandings and agreements between the Parties relating to the Confidential Information, whether written or oral, expressed or implied.

**13.    Counterparts**

This Agreement may be executed in counterparts and each counterpart shall be deemed an original Agreement for all purposes, provided that neither Party shall be bound to this Agreement until both Parties have executed a counterpart.

This Agreement has been entered into by the Parties hereto on the date stated at the beginning of this Agreement.

For and on behalf of MSC CRUISES S.A.

By: ..................................................

Date: Sept 16, 2019

For and on behalf of MAD FRESH
ENTERTAINMENT INC. DBA Shipsomnia

ALESSANDRA MADERNI

By: ..................................................

Date: Sept 16, 2019

4

# EXHIBIT 5

Hi Alessandra,

Was a pleasure to meet Adam, Jay and yourself last night and dinner was very enjoyable.

Following up on the proposed agenda for October, please note the following:

- Luca Pronzati, Chief Business Innovation officer (in CC) will contact you about a pre project concerning our robotic barman (we discussed briefly).
- On Wednesday 16th October, we would like to invite you to our London office to join our new building meetings with Mr Vago and pitch your ideas for our robotic barman.
- Wednesday 16th evening we will fly with Mr Vago to St Nazaire, France (shipyard) to stay onboard and to tour the Grandiosa (that will be delivered on the 31st October)
- Thursday 17th October we will present the aft lounge of Grandiosa which has the same footprint as the aft lounge of Meraviglia 5.  This is the lounge Mr Vago would like your inspiration on as discussed.

---

Please let me know if this schedule works for you.

Mr Onorato and Mr Gangale will contact you separately about the other ideas discussed.

Thanks and look forward to hearing from you.

**Trevor Young**
**Vice President New Building**
**New Building Department**

**MSC Cruise Management (UK) Limited**
**5 Roundwood Avenue**
**Stockley Park**
**Uxbridge**
**UB11 1AF**

**Mobile: +44 (0) 7387259880**
**Email: trevor.young@msccm.co.uk**

# EXHIBIT 6



# EXHIBIT 7

**Vago Pierfrancesco** <pfv@msccruises.com>                           Tue, Nov 26, 2019 at 1:28 PM
To: Alessandra Maderni <ale@madfreshentertainment.com>

Hi Alessandra

Sorry for being so late in coming back to you but really been overwhelmed and definitely running behind my schedule.

Anyway have tried to call you today as have just spoken to Karl in order to explain how we could proceed as I saw you sent me a proposal putting all possible project somehow linked together.

I would suggest in fact to please send me for the time being just the Shipsomnia chapter proposal for a couple of cruises ,as discussed when we were onboard in Saint Nazaire,also because I understood that this would be a priority to you.

Pleased let me know or let us speak

**Thanks and best regards**

**Pierfrancesco Vago**

**Executive Chairman**

**MSC Cruises S.A.**

**Avenue Eugène-Pittard, 40**

**1206 Geneva (Switzerland)**

**Phone:  + 41.22.797.76.62**

**Fax:       +41.22.797.77.23**

**Email:    pfv@msccruises.com**

-

**Visit our website:  www.msccruises.com**

**Learn about our environmental stewardship practices:  www.msccruises.com/Sustainability**



# EXHIBIT 8

**Vago Pierfrancesco** <pfv@msccruises.com>                                    Wed, Feb 2, 2022 at 8:08 PM
To: Alessandra Maderni <am@dreamologylabs.com>

Alessandra
 A parte il fatto che ci ho messo un'ora a riprendermi da quando ti ho visto
My brain was overcharged with blood

Could not speak , literally took me one hour to start making sense…🙂

However it looks like I have to let you down this evening and is better I tell you now so you can still arrange with your friends
It seems my preparation issues with tomorrow meeting is getting a longer time and will possibly carry on till late
Shall we then meet tomorrow at 16.00?
At the hotel ?
So sorry but biz is biz and my responsibility here is gianormous

Best Regards

_____

Pierfrancesco Vago
Executive Chairman
MSC Cruises

Italian:

*A parte il fatto che ci ho messo un'ora a riprendermi da quando ti ho visto*

English:

**"Aside from the fact that it took me an hour to recover after seeing you."**

EXHIBIT 9

**Vago Pierfrancesco** <pfv@msccruises.com>                    Thu, Feb 3, 2022 at 8:13 AM
To: Alessandra Maderni <am@dreamologylabs.com>

Terribly
Could not sleep knowing you were so close ……


Best Regards

Pierfrancesco Vago
Executive Chairman
MSC Cruises

# EXHIBIT 10



## Gmail

Alessandra Maderni <am@dreamologylabs.com>

### Dreamology and Exploraverse Term Sheet

**Alessandra Maderni** <am@dreamologylabs.com>                    Wed, Feb 16, 2022 at 12:45 AM
To: Vago Pierfrancesco <pfv@msccruises.com>

Ciao Pierfrancesco,

Here is a link to review the term sheet: https://docsend.com/view/hqx8nq37ecc7vnu3
Also repasting the link to pitch deck: https://docsend.com/view/5g2dkn2awk7wd4ja

Just to clarify, Shipsomnia is one of the IPs under the Dreamology universe. Just like how Spider-Man, Iron Man, Captain America and all of Marvel's other IPs are interconnected under one universe.

I look forward to finally kick-starting the business relationship with this first milestone. Let me know when is a good time to discuss.

Best,
Ale

### SHIPSOMNIA

**ALESSANDRA MADERNI**   Founder & CEO

am@dreamologylabs.com | www.shipsomnia.com

Shipsomnia Pages:
Personal Pages:

---

**Karl Holz**

I got a deal!! 😭😍🙌🎉... He is super impressed by everything I've done so far, thinks that what I've presented is definitely where the future is headed and sees a lot of value in getting ahead of the game... He just wants to start with something more reasonable than $60M (in milestones) since they are still losing a lot of money with the cruise line and this is totally outside their biz model and something so new for them. He wants to bypass the board and just get it from the marketing department.

Feb 6, 2022 at 3:34 PM

Vago???

Great news!!!

Yes!! I asked him if he was interested in structuring a deal with an equity component and he said for now he would rather be a client because they are an industrial company and not a VC so they don't have that type of risk assessment structure...

---

**Adam Leipzig**

Feb 4, 2022 at 10:00 AM

Adam I got a deal!! 😭😍🙌🎉... He is super impressed by everything I've done so far, thinks that what I've presented is definitely where the future is headed and sees a lot of value in getting ahead of the game... He just wants to start with something more reasonable than $60M (in milestones) since they are still losing a lot of money with the cruise line and this is totally outside their biz model and something so new for them.

What great morning news! What are the proposed terms and milestones?

I have to think about it and get back to him but he gave me confirmation that he is ready to move forward... We don't need the $60m all at once anyways, I was thinking to start off with a super utility NFT campaign tied to sailings while we build an MVP for the tech platform and finish writing the whole story-world...

---

**Jason Garner**

Feb 10, 2022 at 2:38 PM

💗

I got the deal!!! 😭🙌🎉😍... but not jumping out of joy yet until the money is in the bank. Lol

‼️

Long story short... Building an alternate reality universe that connects the digital and physical world through highly immersive story-driven experiences is the same theory as the Metaverse... We are just attacking it from a different angle... When I told him that by offering on board credit through our experience will have a way better conversion than any ad is the same theory as the Metaverse.... I saw the crazy flood of capital into blockchain Metaverse projects and came up with two platforms (for Entertainment & Travel) to reinforce our concept... He was super impressed and said yes.. That he will bypass the board and get the funds from the marketing department.

# EXHIBIT 11

 Gmail

Alessandra Maderni <am@dreamologylabs.com>

**Alessandra**
1 message

**Alessandra Maderni** <am@dreamologylabs.com>                    Tue, Mar 15, 2022 at 11:01 PM
To: Vago Pierfrancesco <pfv@msccruises.com>

Hi Pierfrancesco,

Rebringing this up to the top of your email list as a reminder to review the links before our call.

Pitch deck:  https://docsend.com/view/5g2dkn2awk7wd4ja
Term sheet: https://docsend.com/view/hqx8nq37ecc7vnu3
Sample forecast:  https://docsend.com/view/6pfacpmmpav59iez

Speak to you soon.

Best,
Ale

 **SHIPSOMNIA**

**ALESSANDRA MADERNI**    Founder & CEO

am@dreamologylabs.com | www.shipsomnia.com

Shipsomnia
Pages:
Personal
Pages:

# EXHIBIT 12

**Vago Pierfrancesco** <pfv@msccruises.com>                    Sun, Sep 4, 2022 at 8:15 AM
To: Alessandra Maderni <am@dreamologylabs.com>

Brava Alessandra

Ho sempre pensato che sei la number 1 👍
Sono molto orgoglioso di te
Will support you , you know that

Best Regards

Pierfrancesco Vago
Executive Chairman
MSC Cruises

Translation:

"Well done, Alessandra.

I have always thought that you are number one 👍

I am very proud of you.

I will support you—you know that."

# EXHIBIT 13

**Vago Pierfrancesco** <pfv@msccruises.com>       Tue, Mar 5, 2024 at 2:36 AM
To: Alessandra Maderni <am@dreamologylabs.com>

Fammi diventare il tuo porco

Best Regards

Pierfrancesco Vago
Executive Chairman
MSC Cruises

Translation: "Make me your pig"

EXHIBIT 14



**Pf Vago:**

"Un giorno dopo aver passato una notte insieme potremmo raccontarci un po' di cose"
→ *"One day, after spending a night together, we could tell each other a few things."*

**Maderni:**

"Quando??"
→ *"When??"*

**Pf Vago (Apr 27):**

"Se cancelli non ti parlo più"
→ **"If you delete (intimate) photos again, I will stop talking to you."**

**Maderni:**

"Che cattivo che sei, non è vero che mi vuoi bene 😞"
→ *"You're so mean, it's not true that you care about me 😞"*

"Tanto ho capito, quindi va bene"
→ *"I understand now, so it's fine."*

EXHIBIT 15



**MSC**
C R U I S E S

**CHRONICLES**
Available on: MSC Virtuosa, Location:
Carousel Lounge - LINK HERE
*May 2021*

" The story of a mysterious storyteller who, **by opening an ancient book, awakens forgotten worlds and incredible adventures**. With every turn of the page, a new portal opens to magical realms where gravity is defied, unexpected friendships are forged, and acrobatic wonders take flight. Spectacular characters come to life before your eyes, transforming the stage into a living fairytale where anything is possible. "





**SHIPSOMNIA**












The images above are screenshots from Shipsomnia presentation materials and trailer content disclosed to MSC Cruises and Defendant Vago under the September 2019 NDA. The Chronicles poster book mirrors the Shipsomnia Captain's Logbook in tone, composition, and style — both feature a dark leather-bound book as the cinematic centerpiece, with warm amber and gold tones and ornate decorative cover detailing. Both center on the identical narrative mechanism of a book opening to reveal — in MSC's own words — 'forgotten worlds and incredible adventures' through 'magical realms' populated by 'spectacular characters' — a device Plaintiffs used throughout their live and print presentations displaying the six original Shipsomnia chapters across an animated open book with page-turning motion graphics. Plaintiffs' presentation also included the Professor's Workshop — a scholar's study featuring floor-to-ceiling wooden bookshelves that the Chronicles live stage set directly reproduces — establishing the identical character world of an eccentric scholar-adventurer who inhabits a library of books and maps and invites the audience into his story universe. The Chronicles logo employs the same ornate serif typography, decorative flourish treatment, and aged aesthetic as the Shipsomnia brand identity presented in those same materials.

# EXHIBIT 16







# EXHIBIT 17



### MSC CRUISES

**ARKYMEA -**
available on MSC Virtuosa
7/17/21 - LINK



"ARKYMEA: a show created by Ladybug Production Ltd on behalf of MSC Cruises' CAROUSEL PRODUCTIONS AT SEA Directed by Alberto Sperduto.

According to MSC's promotional materials, Arkymea tells the story of "a scientist who finds a hidden world where the wildest ideas and the most ambitious dreams become reality. With the help of a mysterious device, the scientist breaks through dimensions to reach Arkymea, a mysterious place populated by extravagant characters performing acrobatic feats and where magic comes to life all around you."

Arkymea premiered in the Carousel Lounge of MSC Virtuosa, which entered service on May 20, 2021, after delays from its original November 2020 launch date due to the COVID-19 pandemic.

Prior to delivery, Defendant Vago invited Plaintiffs to tour the MSC Virtuosa at the shipyard in France and specifically directed them to assess the Carousel Lounge — the same venue in which Arkymea subsequently premiered — for the purpose of presenting immersive entertainment concepts for that space.



### SHIPSOMNIA





*Same door image used from our materials.*



*They use a similar composition and tone to our poster.*

*9/17/19 - At the Geneva meeting, Defendant Vago personally requested and received Plaintiffs' physical steampunk costumes, hats, and props — establishing direct physical possession of Plaintiffs' creative materials beyond the presentation itself.*

  

*Scientist characters in our presentations.*

Arkymea mirrors the steampunk aesthetic, scientist-adventurer character archetype, and hidden-world narrative of Plaintiffs' Isle of Salvaga concept — in which a scientist leads guests on an expedition to a hidden world and invites them to join the mission. In MSC's own words, Arkymea is 'a mysterious place where the wildest ideas and most ambitious dreams become reality' — the same narrative premise. The Arkymea stage set incorporates the identical door image from Plaintiffs' confidential moodboards. The Arkymea and Isle of Salvaga posters share the same dramatic composition, steampunk goggle aesthetic, ornate costume detailing, warm amber color palette, and alchemist detail — with potions featured prominently in both.

# EXHIBIT 18





**IMAGINOCEAN -**
**"Underwater Amazement"**
**9/28/22**
LINK, LINK 2 (new article)

Available on: MSC Seascape
Location: Chora Theater

"Dive deep into this celebration of the ocean"

It's described as "an ocean-themed show featuring aerial and flying acts, aquatic animal puppetry, vocalists, and dancers in couture costumes inspired by the sea."



The ImaginOcean poster and Plaintiffs' Shipsomnia poster share the same central composition — a mermaid figure set against an underwater castle and ruins, deep blue and teal tones, and a celestial ocean atmosphere — reflecting the same visual identity and color palette.

MSC's ImaginOcean live production features aquatic puppetry and costumed ocean characters in elaborate marine costumes with vibrant colors — the same aesthetic as Plaintiffs' live Shipsomnia events, photographs and video footage of which were disclosed to Defendant Vago and MSC executives.





Plaintiffs' presentation described Shipsomnia as 'a story driven entertainment-travel experience like no other' in which 'audiences are taken beyond a story and immersed into an alternate reality world seeped in steampunk inspired ocean folklore with an environmental understory.' ImaginOcean mirrors the core narrative premise, visual identity, and immersive ocean mythology of Shipsomnia — both centering on an ocean festival universe populated by mermaids, mythical sea creatures, and anthropomorphic marine characters in elaborate couture costumes. The ImaginOcean and Shipsomnia posters share the same composition — a central mermaid figure set against an underwater castle or ruins, deep blue and teal tones, and a celestial ocean atmosphere. MSC's live production features aquatic puppetry and costumed ocean characters that directly mirror Plaintiffs' live event aesthetic.





EXHIBIT 19





**Pirates Cove Aquapark - MSC Seascape (delivered: 11/16/22) and MSC Seashore (delivered July 26, 2021)**
According to a case study published by WhiteWater, the company that designed and built the waterpark, the project was originally planned as an intergalactic adventure-themed attraction. It was MSC Cruises' Executive Chairman, Pierfrancesco Vago, who directed the team to redesign the concept around a pirate ship and a giant Kraken. The case study credits Vago as the creative driver of the resulting design and describes the attraction as transporting guests into another world — 'making them the main characters in an exciting pirate story'. The case study makes no mention of Plaintiffs, Shipsomnia, or the NDA-protected materials disclosed to Defendant Vago.

> ❝ **CASE STUDY: THE VISION FOR THE WATER PARK** LINK 1 , LINK 2
>
> Leading the design of the water park was Anthony Marinakis, Creative Director at WhiteWater, who collaborated closely with MSC Cruises' team to create something truly unique. Initially planned as an intergalactic adventure-themed water park, it was **MSC Cruises' Executive Chairman, Pierfrancesco Vago**, who pushed the team to dream bigger. As the MSC Seascape was being redesigned to provide guests with a strong connection to the sea, Mr. Vago believed that the water park's theming should also reflect this nautical premise. He recommended incorporating a pirate ship and the imagery of a giant Kraken to better cater to the changing demographics of the cruise industry, which has seen a rise in families as opposed to retirees. The water park needed to evoke a sense of adventure in guests and transport them into another world, making them the main characters in an exciting pirate story. ❞







Plaintiffs' Shipsomnia production featured giant Kraken tentacles emerging from a ship's deck as early as June 2017 — years before MSC's Pirates Cove Aquapark was developed — photographs and video footage of which were disclosed to Defendant Vago and MSC executives. Though executed as permanent hard structures compared to Plaintiffs' air-blown fabric production, the Pirates Cove tentacles reflect the same color, sculptural form, and design concept — including the identical visual mechanic of tentacles emerging from the ship's deck, wrapping around overhead structures, and surrounding a water feature in the same spatial relationship and scale. Plaintiffs' presentation described Shipsomnia as 'an immersive story-driven experience where the fans truly become part of the story' — directly mirroring MSC's own description of Pirates Cove as 'making them the main characters in an exciting pirate story' — the same guest-participation mechanic Plaintiffs disclosed to Defendant Vago and MSC executives.



**STARRING… YOU!**

ARGs are built in a way that allows players to feel like they have a key role in creating the fiction and meaningfully affect how the story progresses.

"An immersive story-driven experience where the fans truly become part of the story."

# EXHIBIT 20




EXHIBIT 21









Plaintiffs presented Defendant Vago and MSC executives with a Shipsomnia coin at the September 17, 2019 Geneva meeting — a physical branded asset bearing the Shipsomnia Kraken silhouette. The same Kraken silhouette appears in several of the Plaintiffs' presentation materials. The circular Kraken silhouette at the base of the Pirates Cove Aquapark splash pool closely mirrors the form, posture, and composition of the Kraken depicted on Plaintiffs' coin — physically placed in Defendant Vago's possession at the NDA-protected Geneva presentation.

EXHIBIT 22

**Award Winning:**
The Pirates Cove Aquapark by WhiteWater wins the Leading Edge Award in 2023 by the WWA, World Waterpark Association. The Leading Edge Awards are given to waterparks and suppliers that show **creativity and innovation in waterpark design** - LINK

## WhiteWater celebrates three wins at 2023 WWA Leading Edge Awards

Studio City Water Park, Island Waterpark at Showboat, and Pirates Cove Aquapark on MSC Seascape were all honoured

In 2023, the Pirates Cove Aquapark aboard MSC Seascape received the Leading Edge Award from the World Waterpark Association — an award recognizing creativity and innovation in waterpark design. The award was accepted by MSC Cruises and WhiteWater, the design vendor whose publicly circulated case study credits Defendant Vago as the creative driver of the Kraken-and-pirate nautical theme. The Leading Edge Award publicly recognized as creative and innovative the precise thematic elements — Kraken mythology, pirate nautical narrative, and immersive guest-participation mechanics — that Plaintiffs had disclosed to Defendant Vago and MSC executives under NDA years earlier. Defendant Vago received public credit and industry recognition for concepts Plaintiffs allege originated with them."





# EXHIBIT 23

**Exhibit 23:**







**MSC Virtuosa — Atmosphere Pool**
Entered service: May 20, 2021

The Atmosphere Pool is the main pool of MSC Virtuosa, spanning over 18,000 sq. ft. and capable of accommodating 1,000+ guests. The pool deck features multiple oversized, vertically-oriented fish sculptures emerging from the water as the central design feature — stylized with a ceramic glaze inspired rough painted-on design, scale patterns, a ceramic finish aesthetic, and a monochromatic marine two-tone color palette, arranged around a shallow pool roughly 10 feet apart from each other.









**Mermaid Sanctuary — Pool Stage**
Shipsomnia "Tale of the Kraken," 2017

The Mermaid Sanctuary was the pool stage of Shipsomnia's 2017 "Tale of the Kraken" sailing, featuring two oversized, vertically-oriented fish sculptures on small platforms as a central design feature — stylized with a ceramic glaze-inspired, rough painted-on design, scale patterns, a ceramic finish aesthetic, and a monochromatic marine two-tone color palette, arranged around a shallow pool as part of an immersive themed environment.

This design was featured on page 8 of the "Shipsomnia Deck June 2020," presented to MSC executive Luca Vago under NDA, in the context of a proposed "Shipsomnia Day at Sea" partnership.

MSC Virtuosa entered service in May 2021 — after MSC's access to Shipsomnia's confidential materials.

# EXHIBIT 24

ARTICLE

# Case Study: Pirates Cove Aquapark on board the MSC Seascape

Cassidy Newman

17th July 2023 | 6 min read

NEWS

## Creating the Longest Ship in the Fleet

MSC Cruises, one of Europe's top entertainment companies, is dedicated to pushing the industry's boundaries. While other cruise ship brands focus on lavish shows and gourmet dining, MSC sets itself apart with exceptional aquatic amenities.

In 2022, MSC Seascape underwent a remarkable transformation, expanding its public spaces by an impressive 65%. This extensive renovation made it the longest vessel in MSC's fleet. As the first MSC ship to be christened in New York City, the Seascape draws inspiration from esteemed American entertainment giants like Universal and the Walt Disney Company to set world-class standards. The Pirates Cove Aquapark on board embraces themed elements, providing a unique experience for guests.



Continued on next page.

MSC Seascape, Photo Credit: CruiseMapper

## The Vision for the Water Park

Leading the design of the water park was Anthony Marinakis, Creative Director at WhiteWater, who collaborated closely with MSC Cruises' team to create something truly unique. Initially planned as an intergalactic adventure-themed water park, it was MSC Cruises' Executive Chairman, Pierfrancesco Vago, who pushed the team to dream bigger. As the MSC Seascape was being redesigned to provide guests with a strong connection to the sea, Mr. Vago believed that the water park's theming should also reflect this nautical premise. He recommended incorporating a pirate ship and the imagery of a giant Kraken to better cater to the changing demographics of the cruise industry, which has seen a rise in families as opposed to retirees. The water park needed to evoke a sense of adventure in guests and transport them into another world, making them the main characters in an exciting pirate story.

## The Most Immersive Water Park at Sea

Designing a cruise ship comes down to practicalities: size, weight, footprint, and number of crew required to operate while factoring in stability, deck space, and wind force. Having worked together on over 10 cruise ships, MSC knew WhiteWater would carefully consider the unique demands of this venue type and create an epic mix of attractions to serve guests of all ages. The ship's redesign aimed to provide guests with an unparalleled connection to the sea, and this philosophy extends to the water park. The Pirates Cove Aquapark features two AquaTube water slides spiraling above the deck, utilizing a combination of fiberglass effects to deliver an exceptional ride. Translucent fiberglass, renowned for its clarity and strength, illuminates enclosed flumes, allowing riders to anticipate what lies ahead. Alternating between light and dark sensations, achieved through the pairing of translucent and opaque flumes, adds an element of excitement, keeping riders in suspense as they wonder what awaits around each bend and creating an illusion of suspension above the sea below.

While the AquaTubes bring thrills for guests over 102 cm tall, the water park also offers an AquaPlay 150 and Pool Sider for younger sailors. Themed after a pirate ship, the custom-made aquatic play structure uses interactives and a tipping bucket to engage children and create an immersive playground without queues. Complete with 225 square meters of Life Floor safety tiles, the water park uses four different colours of triangles strategically placed to create an effect that emulates a greater depth of water as the guest moves closer to the center of the park. The use of Life Floor not only adds an aesthetic and additional layer to the park's theming but also improves overall safety, reducing the number of trips and falls with its slip-resistant material.



MSC Seashore, Pirates Cove Aquapark



AquaTube, MSC Seascape, Photo Credit: Cruise Fever / Ben Souza

## Mixing Wet & Dry Attractions

Extending the fun into dry attractions, the water park also includes an Adventure Trail. A structure where the entire family can explore together, this high-volume, unharnessed net play structure encourages crisscrossing between soaring towers, rope bridges, climbs, and slides. With enhanced views due to the elevated nature, the Adventure Trail continues the pirate story and creates the effect of placing guests in the "crow's nest" to spot other ships on the horizon.

The most eye-catching aspect of the water park, the Adventure Trail features hand-carved tentacles from the Kraken that wrap around one of the towers from the pool below. This image, combined with the soaring rope bridges, truly paints the scene to bring guests into the realm of audacious pirates.

"You can't walk into Pirate's Cove Aquapark without a huge smile on your face," said Trevor Young, VP New Building Department at MSC. "WhiteWater did a great job with the giant kraken tentacles and pirate play structure; they really help to bring the park's story to life. The theming combined with the picturesque sea around the ship really brings guests into this narrative of an epic pirate adventure."

Continued on next page.



Image Credit: MSC Cruises

## Water Slide Experiences of the Future

With guests boarding the vessel for up to seven nights at a time, MSC knew it was important to offer an activity that was not only unique but repeatable, entertaining travelers throughout the length of their journey. This is where WhiteWater came in. The water park manufacturer created a custom sound and light package for the cruise line company. At the push of a button, the water slide plays music and uses LED rings that change colour, creating a different ride every time so the guest would notice new song lyrics or a different colour on display as they soar through the Giant AquaTube.



Continued on next page.

## Generating More Sustainable Sailings

A shared priority between the two companies, WhiteWater worked with MSC to enable the ship's water park to operate in the most sustainable way possible. Because of the unique venue type, WhiteWater's designers analyzed many elements not traditionally included in a water park, including the vibrations and the movements of the vessel. Water usage is an important factor in these calculations as it contributes towards the weight of the ship, affecting not only how much water the park would use but also how heavy the mechanical equipment would have to be to operate the attractions.

To mitigate water consumption, WhiteWater used 3D modeling and simulations during the design process to calculate exactly how much water will be used and not over-specify the pumps. By applying low-entry tubs and wave catchers in the run-out lanes, the manufacturer was also able to help protect against water loss during the park's operations. Other notable sustainability efforts on the ship include cutting-edge hybrid exhaust gas cleaning systems, selective catalytic reduction systems, achieving a 98% reduction of sulfur oxide emissions, and reducing nitrogen oxide emissions by 90%.



Pool Sider, MSC Seascape, Photo Credit: Cruise Fever

## Looking Ahead

Marrying together technology, sustainability, and theming, Pirates Cove Aquapark has been redesigned to generate a more impactful guest experience, helping to set the standard of what cruise ship water parks should be.

# EXHIBIT 25



**Source:** Independent Damages Analysis by Eqvista – Track B (Summary of Findings), prepared for Dreamology Labs, Inc.

**Preliminary But-For Damages Summary**

Based on an independent damages analysis prepared for Plaintiffs, the but-for enterprise value of the contemplated MSC-supported commercial opportunity is estimated at approximately **$1.9 billion**.

The analysis compares:

- a **but-for scenario** in which MSC proceeds with the contemplated partnership; and

- **residual scenarios** in which MSC does not participate, resulting in significantly reduced enterprise value.

Under this framework:

- Estimated but-for enterprise value: **$1,899,831,812**

- Estimated residual enterprise value (no MSC): **$9.3 million – $50.9 million**

- **Estimated differential damages:
  $1,848,891,369 – $1,890,567,585**

These figures are based on a preliminary but-for valuation and are subject to refinement through discovery, expert analysis, and updated assumptions.